**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

G.K. LTD. TRAVEL, an Oregon
corporation; WH GILLISON;
RAMSAY SIGNS, INC., an Oregon
corporation; KATHLEEN KUSUDO,
         *Plaintiffs-Appellants,*

        v.

CITY OF LAKE OSWEGO; SANDY
INGALLS,
        *Defendants-Appellees.*

No. 04-35416

D.C. No.
CV-02-01147-GMK

OPINION

Appeal from the United States District Court
for the District of Oregon
Garr M. King, District Judge, Presiding

Argued and Submitted
September 15, 2005—Portland, Oregon

Filed January 26, 2006

Before: Raymond C. Fisher, Ronald M. Gould and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Fisher

1097

## COUNSEL

John F. Winston (argued), Sherwood, Oregon, and Douglas M. Bragg, Tualatin, Oregon, for the plaintiffs-appellants.

Timothy J. Sercombe (argued) and Carra L. Sahler, Preston, Gates & Ellis, LLP, Portland, Oregon, for the defendants-appellees.

## OPINION

FISHER, Circuit Judge:

Plaintiffs-appellants ("plaintiffs") are the owners of a pole sign used to advertise their travel business in the City of Lake Oswego ("City").[1] With the stated purpose to reduce visual

---

[1] A pole sign is defined as a "free standing sign erected on one or more supports which are more than 30 inches above the adjacent ground surface." Lake Oswego Sign Code ("LOC") § 47.03.015.

blight and protect traffic and traveler safety, the City has enacted a sign code ordinance ("Sign Code" or "Code") regulating the type, size and design of all signs erected within its borders. The Sign Code prevents plaintiffs from continuing to use their pole sign, because that form of sign is severely restricted. Plaintiffs challenge the constitutionality of the Sign Code, raising multiple as-applied and facial claims. The district court granted summary judgment to the City, in large part, and plaintiffs appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

## I.   Background

### A.   Plaintiffs' Pole Sign

Plaintiff Ramsay Signs, Inc. ("Ramsay") owns a 42.5-square-foot pole sign that has been used since 1980 in Lake Oswego. Ramsay leased its pole sign to Journeys! of Lake Oswego ("Journeys!") in 1996 for the purpose of advertising the Journeys! travel business. In February 2001, plaintiff G.K. Ltd. Travel ("G.K.") purchased Journeys! along with the pole sign lease and instructed Ramsay to change the copy of the pole sign to advertise G.K.'s travel business. Ramsay accordingly changed the text on the sign from "Journeys! of Lake Oswego, Formerly Apollo Travel" to "G.K. Ltd. Travel Groups Tours Cruises Complete Travel Services Domestic & International." The City's Code Enforcement Specialist, Sandy Ingalls, notified the plaintiffs that because they were changing the copy on their pole sign as a new business, the sign had to conform with the Sign Code. Conformity, in this case, meant removing the sign altogether because the Sign Code prohibits pole signs in Lake Oswego unless statutorily defined special circumstances exist, none of which were applicable to plaintiffs. *See* LOC § 47.04.100(1).[2]

---

[2]Section 47.04.100(1) provides,

> A non-conforming sign in all zones other than the EC zone as described and established by the Lake Oswego Zoning Code may

Plaintiffs sought and were denied a permit to change their pole sign's text without having to remove the sign itself. The City eventually cited plaintiffs for violating the Sign Code and insisted that plaintiffs remove the pole sign. Plaintiffs then sought a variance for their sign, but this too was denied by the City Planning Director. Plaintiffs appealed the variance denial to the City Development Review Commission and the City Council, both of which affirmed the Planning Director. Plaintiffs then filed suit in federal district court.

Plaintiffs insist that their pole sign is a cheap, effective and significant means of attracting clients and, without the sign, plaintiffs will lose a substantial amount of income. Plaintiffs seek to have the Sign Code declared unconstitutional.

B.   The Sign Code

As stated in a memorandum of the City of Lake Oswego's Department of Planning and Development, the Sign Code is the City's response to a State of Oregon instruction to cities and counties to adopt comprehensive land use plans with the aim of "encourag[ing] design of public and private facilities and structures which enhance community beauty." *See* Or. Rev. Stat. § 197.175(2)(a). In 1994 the City passed the current version of the Sign Code in order to cure earlier perceived constitutional defects. By regulating all signs in the City, the Sign Code seeks, among other things, to reduce visual clutter, preserve the City's aesthetics and protect traffic and traveler safety. *See* LOC § 47.03.010 ("The City Council finds that to protect the health, safety, property and welfare of the public, to provide the neat, clean, orderly and attractive appearance of the community . . . ."). In developing and amending the

be maintained or undergo a change of copy without complying with the requirements of this chapter, with the exception that any change for a new business or use or any changes in a wall sign which is painted on a structure will comply with this chapter at such time as change in copy or alteration occurs.

Sign Code, the City's Planning Commission conducted public hearings, considered the success other cities had experienced with their own sign codes and reviewed an Urban Land Institute study on signage and communities. Notably, during Council deliberations concerning the Sign Code, businesses presented recommendations to the City, many of which were incorporated.

The Council's consultative process culminated in the current Code, which limits the number and type of signs permitted in the City. The Code lays out specifications for all signs and, importantly for plaintiffs, generally prohibits pole signs. The Code is not triggered for the many preexisting signs in most of the City's zones until a new business or use requires a change in copy of the sign or the sign is altered.[3] LOC § 47.04.100 (the "grandfather clause"). However, pole signs had to conform to the Sign Code by May 21, 2004; in other words, almost all pole signs in Lake Oswego were to have been removed by this date. *See G.K. Ltd. Travel v. City of Lake Oswego*, 2004 U.S. Dist. LEXIS 6984 at *3 (D. Or. Mar. 29, 2004) ("*G.K. Ltd. Travel I*"). In addition to regulating the dimensions and characteristics of all signs in the City, the Code includes a permit and design review process that requires those seeking to erect a sign to allow City officials to review the sign for readability, clarity and compatibility. LOC §§ 47.10.400, 47.06.200(4), 47.06.200(5). If a permit is denied, the permit-seeker may appeal to the City Development Review Commission and ultimately to the City Council. The Code also contains exemptions from the City's permitting process. If an exemption applies, the sign still must "comply with all provisions and regulations of [the Code]," but a permit is not required prior to installation. LOC §§ 47.06.205, 47.08.300. Specifically, the Code exempts "[p]ublic signs,

---

[3]A "change of copy" is defined as "the change of logo and/or message upon the face or faces of a legal sign." LOC § 47.03.015. "Alter" is defined as "[a]ny change to a sign excluding change of copy or maintenance — when there is no change of use, or occupancy or ownership." *Id.*

signs for hospital or emergency services, legal notices, rail-road signs and danger signs" from the permitting process. LOC § 47.06.205(4). The Code also exempts temporary signs from the permitting requirement so long as the temporary sign goes up within a specified time period triggered by the occurrence of an enumerated event, such as an election or the sale, lease or rental of property.[4] *See*, *e.g.*, LOC § 47.08.300(B)(1). Finally, the Code incorporates a variance procedure to ease the burden of the Code's application in some cases. LOC § 47.12.500.

C.   Plaintiffs' Claims

Focusing on the Sign Code's restrictions on pole signs, plaintiffs raise two as-applied challenges to the Code claiming that the Code's size and type limitations and the Code's grandfather clause unconstitutionally regulate plaintiffs' speech on the basis of content. Plaintiffs want these provisions stricken from the Sign Code and suggest that without these provisions, the balance of the Sign Code should be rendered unenforceable. Plaintiffs further claim that the ban on pole signs is an unconstitutional ban on a protected medium of speech as applied to the plaintiffs, because pole signs are "a unique form of communication."

Plaintiffs also attack the Sign Code by way of several facial challenges, asserting that they are entitled to declaratory, injunctive and monetary relief. Plaintiffs argue that the Code, particularly its exemptions from the permitting process, its grandfather clause and its design review process allowing officials to read signs for clarity and readability, represents a facially unconstitutional regulation of noncommercial and

---

[4]Temporary sign is defined as "[a]ny sign, banner, pennant, valance or advertising display constructed of cloth, canvas, light fabric, cardboard, wallboard or other like materials, with or without frames, and any other type sign not permanently attached to the ground, or a structure, intended to be displayed for a short period of time only." LOC § 47.03.015.

commercial speech based on content or viewpoint, or alternatively represents an unreasonable time, place or manner regulation. They also challenge the Code as a facially unconstitutional preference for commercial over noncommercial speech because of the treatment of temporary signs in residential zones. LOC § 47.08.300(B). Finally, plaintiffs claim the permitting scheme (including the design review provision of the Code), LOC §§ 47.10.400, 47.06.200(4), is an unlawful prior restraint on speech and unconstitutionally vague.[5]

D.   District Court Disposition

The district court, in large part, granted summary judgment for the City. In ruling on the content neutrality of the Sign Code, the district court meticulously reviewed provisions of the Code challenged by plaintiffs as content based. The district court determined that the vast majority of the provisions were content neutral, but found that a limited portion of the Code was content based. Specifically, citing *Desert Outdoor Adver. v. City of Moreno Valley*, 103 F.3d 814, 820 (9th Cir. 1996), the district court found content based the exemptions from the permit requirements for danger signs, official notices and "no solicitation" signs, LOC §§ 47.06.205(4), 47.06.205(10). It also found content based the allowance, without a permit, of temporary signs in commercial or industrial zones for charitable fundraising events, LOC § 47.08.300(B)(2)(c), because the court found it represented the City's preference for a certain message. The district court ordered these subsections stricken from the Sign Code, but found the Code otherwise constitutional. *G.K. Ltd. Travel I*, 2004 U.S. Dist. LEXIS 6984 at *24, 48. The City does not appeal these rulings. The district court also granted summary judgment to the City on the plaintiffs' as-applied claims.

---

[5]In district court, plaintiffs also raised equal protection and takings arguments. The district court granted summary judgment for the City on these claims and plaintiffs do not appeal.

We review de novo the constitutionality of a local ordinance. *See RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1141 (9th Cir. 2004). We focus, primarily, on plaintiffs' challenge to the pole sign regulations and plaintiffs' facial challenges to the Sign Code summarized above. More specifically, we address five issues: (1) whether the Sign Code's regulation of pole signs is constitutional; (2) whether the Sign Code otherwise is a constitutional, content-neutral time, place or manner restriction on speech; (3) whether the Sign Code's regulation of temporary signs in residential zones indicates an impermissible preference for commercial over noncommercial speech; (4) whether the Sign Code's permitting scheme is an unconstitutional prior restraint; and (5) whether the Sign Code, and specifically its design review clause allowing City officials to review signs for "compatibility," is unconstitutionally vague. In all respects, we hold the Sign Code a constitutional and permissible government regulation.

## II.   Pole Sign Regulation

The Code restricts the availability of pole signs as a carrier of communication in the City. *See*, *e.g.*, LOC §§ 47.04.100, 47.04.102, 47.10.405(1)(D), 47.10.410(1)(D). However, pole signs are permissible in the City's general commercial zones "when necessary to provide vision clearance at driveways or intersections and when there is no alternative, visible on-building or monument sign location." LOC § 47.10.410(1)(D). Plaintiffs urge that because the Sign Code bans their pole sign, it is an unconstitutional regulation of plaintiffs' speech and that the Code impermissibly bans a protected medium of expression in violation of *City of Ladue v. Gilleo*, 512 U.S. 43, 54 (1994) (holding unconstitutional a city's ban on all residential signs, because they are a "venerable means of communication that is both unique and important").

**[1]** The "government may impose reasonable restrictions on the time, place, or manner of engaging in protected speech

provided that they are adequately justified without reference to the content of the regulated speech." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428 (1993) (internal quotation marks and citation omitted). In addition to being justified without reference to content, the restrictions must be "narrowly tailored to serve a significant governmental interest and . . . leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citing *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

A.    Justified Without Reference to Content

To pass muster under *Ward*, the challenged regulation must first be "justified without reference to the content of the regulated speech." *Id.* Our primary concern is determining whether a regulation of speech was adopted out of disagreement with a message sought to be conveyed. "The government's purpose is the controlling consideration." *Id.* However, we need not engage in a searching inquiry of the legislature's motive to determine the government's purpose. Rather, "whether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005) (citing *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring)) (internal quotation marks omitted).

**[2]** The pole sign restriction is not a "law[ ] that by [its] terms distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 643 (1994). The Code restricts all pole signs across the City's general commercial zones without creating exceptions for preferred content. *Cf. Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th Cir. 1998). The burdens imposed by these pole sign restrictions are borne equally by all of the City's residents. *See Turner Broad. Sys.*, 512 U.S.

at 643. Further, plaintiffs offer no evidence suggesting illicit motive or bias on the part of the City or that the City banned pole signs in general, or their pole sign in particular, because of a desire to stifle certain viewpoints. *See City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).

Plaintiffs argue that the Code's grandfather clause, LOC § 47.04.100, exempting the City's preexisting signs from compliance with the Sign Code until there has been a change in copy or alteration, is content based because it requires City officers to "read a sign's message to determine if the sign is exempted from the ordinance." *Foti*, 146 F.3d at 636. It is not clear, however, that officers merely examining the face of the sign to determine whether its text or graphics have changed in a technical sense renders the grandfather provision content based. Regardless, at this point, we need not determine whether the grandfather clause as applied to plaintiffs is an unconstitutional content-based regulation of speech, because all pole signs, including preexisting, grandfathered ones, were to be brought into compliance with the Sign Code's mandates by May 21, 2004. *See GK Ltd. Travel I*, 2004 U.S. Dist. LEXIS 6984 at *3; LOC § 47.04.100(5). Therefore, the question of the constitutionality of the grandfather clause as applied to pole signs is now moot. *See Clark v. City of Lakewood*, 259 F.3d 996, 1011 (9th Cir. 2001) ("[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.") (internal citations omitted).

**[3]** We conclude that the City's restriction on plaintiffs' pole sign is not a content-based regulation of plaintiffs' speech. We therefore turn to whether the City's interest in regulating pole signs is significant, whether the restriction is narrowly tailored and whether plaintiffs retain ample alternative channels to communicate their message.

B.   Significant Government Interest

**[4]** Content-neutral time, place or manner restrictions must advance a significant government interest in order to be con-

stitutional. *See Ward*, 491 U.S. at 791. Through the Code's statement of purpose, the City asserts numerous interests in passing its sign regulations, including its pole sign restriction. Section 47.03.010 states:

> The City Council finds that to protect the health, safety, property and welfare of the public, to provide the neat, clean, orderly and attractive appearance of the community, to improve the effectiveness of signs, to provide for safe construction, location, erection, and maintenance of signs, to prevent proliferation of signs and sign clutter, and to minimize adverse visual safety factors to travelers on public highways and on private areas open to public travel, it is necessary to regulate [signs] . . . .

[5] Of the justifications for the Sign Code and its restriction on pole signs, the two most prominent are the preservation of the City's aesthetic quality and the protection of travel safety. These are oft-invoked objectives with a rich history of judicial endorsement, and sometimes skepticism. *See Foti*, 146 F.3d at 637 n.8. Against the backdrop of numerous decisions of the Supreme Court and this court, we do not doubt that Lake Oswego's interests in its appearance and the safety of the public are significant and well established. *See Taxpayers for Vincent*, 466 U.S. at 807 ("The problem addressed by this ordinance — the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property — constitutes a significant substantive evil within the City's power to prohibit."); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507 (1981) ("Nor can there be substantial doubt that the twin goals that the ordinance seeks to further — traffic safety and the appearance of the city — are substantial governmental goals."); *Foti*, 146 F.3d at 637.

Plaintiffs seem to argue that even if the general interests in preventing visual blight and ensuring travel safety are significant, they are not significant for Lake Oswego because the

City has neither established that it has a problem with visual blight or travel safety, nor that the pole sign restriction would actually advance the City's asserted interests.[6] In the absence of such evidence, plaintiffs contend, the Sign Code is a constitutionally defective means for advancing any governmental interest, significant or otherwise.

[6] These arguments are not convincing. As to whether the City's interests are actually served by the Sign Code, we generally defer to the legislative body passing the law in determining whether the government's ends are advanced by a regulation. *See City of Lakewood*, 259 F.3d at 1015. Further, the Sign Code, including the pole sign restriction, was the result of much legislative deliberation, a dynamic dialogue with the City's residents and businesses and extensive hearings; these conversations, along with Council reliance on the experience of other cities, produced strong evidence of the need for sign restrictions and the form these restrictions should take.[7] This evidence provided the City with legitimate and relevant bases for advancing its Sign Code and restricting the availability of pole signs. *See Lorillard Tobacco v. Reilly*, 533 U.S. 525, 555 (2001) ("We have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based

---

[6]Plaintiffs also argue that the City's willingness to exempt certain, pre-existing signs from the regulations indicates that the City's interests are not substantial. *See* LOC § 47.04.100. However, the City's interests are advanced by substantial reduction in offensive signage even when all such signs are not immediately removed. "We [do not] require that the Government make progress on every front before it can make progress on any front." *United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993). *See also Moser v. FCC*, 46 F.3d 970, 974 (9th Cir. 1995).

[7]At one City public hearing, a resident characterized pole signs as a "visual pollution." Furthermore, a Department of Planning and Development memorandum indicates that businesses "approached the City requesting monument signs to replace pole signs which become less visible as street trees grow taller."

solely on history, consensus, and 'simple common sense.' "); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986) ("The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.").

### C.   Narrowly Tailored

**[7]** A content-neutral regulation designed to advance significant government interests must be narrowly tailored to be constitutional. Narrow tailoring requires that the regulation actually advance the government's interests, but it need not do so in the least restrictive or least intrusive way. *See State University of New York v. Fox*, 492 U.S. 469, 479 (1989); *Ward*, 491 U.S. at 799. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . , the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800.

**[8]** Plaintiffs argue that the restriction on pole signs is not narrowly tailored because it goes further than necessary to achieve the City's interests in aesthetics and traffic safety. We do not agree. The Code permissibly and in a narrowly tailored way limits the prominence of plaintiffs' advertising sign by restricting its length and position. *See Foti*, 146 F.3d at 641 (in holding a sign restriction to be narrowly tailored, we noted "[t]he restrictions on the size and number of picket signs are reasonable legislative judgments in light of the City's concern for traffic safety."). Because of their height, pole signs, as defined by Lake Oswego, can reasonably be perceived by the City to be aesthetically harmful and distracting to travelers. *See Metromedia*, 453 U.S. at 510 ("It is not speculative to recognize that billboards by their very nature, wherever located

and however constructed, can be perceived as an 'esthetic harm.' ''). Severely limiting their presence in Lake Oswego directly serves the City's purposes. *See Taxpayers for Vincent*, 466 U.S. at 808 ("By banning these signs, the City did no more than eliminate the exact source of the evil it sought to remedy."). The Sign Code's pole sign restriction is a narrowly tailored means of achieving the City's significant interests.

### D.   Ample Alternative Channels

**[9]** Even a narrowly tailored content-neutral regulation must not foreclose too many channels of expression; there must be ample alternative opportunities for a speaker to convey his or her message. In our analysis, however, we are cautioned against invalidating government regulations for failing to leave open ample alternative channels unless the regulation foreclose[s] "an entire medium of public expression across the landscape of a particular community or setting." *Colacurcio v. City of Kent*, 163 F.3d 545, 555 (9th Cir. 1998) (citing *Metromedia*, 453 U.S. at 525-27 (Brennan, J., concurring)).

**[10]** Although it restricts the availability of pole signs in the City, the Code says nothing about other non-sign-based forms of communication such as handbills, radio, television, newspaper or telemarketing. *See Bland v. Fessler*, 88 F.3d 729, 736 (9th Cir. 1996). Even with respect to signage, the Code itself authorizes wall signs, monument signs, awning and canopy signs, blade signs and overhanging signs, allowing plaintiffs a "reasonable opportunity" to communicate their message. *See* LOC §§ 47.03.015, 47.10.412, 47.10.415, 47.10.420; *Menotti*, 409 F.3d at 1141 (citing *City of Renton*, 475 U.S. at 54). In light of these ample alternatives, we cannot invalidate the Sign Code merely because it restricts plaintiffs' preferred method of communication.[8] *See Taxpayers for*

---

[8]More extensive restrictions banning "a venerable means of communication that is both unique and important" might be unconstitutional. *City*

*Vincent*, 466 U.S. at 812 ("[T]he First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places"); *Kovacs v. Cooper*, 336 U.S. 77, 88-89 (1949) ("That more people may be more easily and cheaply reached by sound trucks . . . is not enough to call forth constitutional protection for what those charged with public welfare reasonably think is a nuisance when easy means of publicity are open.").

**[11]** In sum, we hold that the Sign Code's pole sign restriction is justified without reference to the content of the regulated speech, is narrowly tailored to achieve the City's significant interests in aesthetics and traffic and traveler safety and, although it forecloses the availability of pole signs, it leaves open ample alternative means of communicating the plaintiffs' advertising message. The City's pole sign restriction, as applied to plaintiffs, is constitutional.

### III.    Content Neutrality of the Remaining Provisions of the Sign

Plaintiffs next contend that even if the City may properly regulate and restrict their pole sign, the Code impermissibly infringes on the First Amendment rights of third parties. At the outset we note that plaintiffs need not establish standing

---

*of Ladue*, 512 U.S. at 54. However, plaintiffs do not prove that pole signs occupy such a "venerable" position in Lake Oswego. For example, there is no explanation why plaintiffs consider pole signs to be "unique and important" in Lake Oswego or that monument or on-building signs would not effectively serve plaintiffs' communicative interests. Indeed, other businesses encouraged the City to have monument signs replace pole signs. *See Taxpayers for Vincent*, 466 U.S. at 812 ("Notwithstanding appellees' general assertions in their brief concerning the utility of political posters, nothing in the findings indicates that the posting of political posters on public property is a uniquely valuable or important mode of communication, or that appellees' ability to communicate effectively is threatened by ever-increasing restrictions on expression."). For this reason, plaintiffs' as-applied challenge to the Sign Code as "banning a medium" also fails.

prior to bringing this form of facial challenge, which seeks to invalidate the entire ordinance. *See Foti*, 146 F.3d at 635 ("The second type of facial challenge is an exception to our general standing requirements: the plaintiff argues that the statute is written so broadly that it may inhibit the constitutionally protected speech of third parties, even if his own speech may be prohibited. A successful challenge to the facial constitutionality of a law invalidates the law itself.") (internal citations omitted). In evaluating plaintiffs' facial challenge, we apply the same content-neutrality test articulated in *Ward* and addressed more fully above in our discussion of the Code's pole sign restriction.

## A.    Justified Without Reference to Content

Plaintiffs identify several portions of the Code that they urge us to hold content based. The vast majority of plaintiffs' identified provisions clearly are not content — or viewpoint — based. There is no indication either on the face of the ordinance or in the evidence in the record that the City's purpose in adopting the Sign Code, and its size and type restrictions, was to regulate speech on the basis of content. *See Madsen v. Women's Health Ctr.*, 512 U.S. 753, 763 (1994) ("We . . . look to the government's purpose as the threshold consideration."); *see also City of Ladue*, 512 U.S. at 48 ("It is common ground that governments may regulate the physical characteristics of signs. . . ."); *Foti*, 146 F.3d at 640 ("We have upheld restrictions on the size and aggregate area of signs posted on private property based on a city's interests in aesthetics.") (internal citations omitted).

Although most of the provisions describe the type and dimensions of permissible signs, plaintiffs do identify a few potentially suspect portions of the Code, quoting *Foti*, 146 F.3d at 636, and asserting that "in this circuit a regulation of speech is 'content-based [if] a law enforcement officer must read a sign's message to determine if the sign is [regulated.]' " These possibly content-based provisions are: (1) An

exemption from the permit requirement for public signs, hospital or emergency signs, legal notices, railroad signs and danger signs, LOC § 47.06.205(4); and for temporary signs during enumerated events, like elections, LOC § 47.08.300(B)(1)(a) (during elections, residents are exempt from the permit requirements otherwise imposed on temporary signs). (2) One section that grandfathers in old, nonconforming signs but requires these signs to conform with the regulations when the sign is altered. LOC §§ 47.04.100, 47.04.102. (3) The design review provision (incorporated into the Code's permitting process) that requires City officials to review signs for clarity and readability. LOC § 47.06.200(5). We review each provision below, and hold that neither the Code as a whole nor these provisions in particular regulate speech on the basis of content. Therefore, the Sign Code is content neutral.

1. *Exemptions of Certain Signs from the Permit Requirement*

a. *Speaker-based exemptions*[9]

Section 47.06.205(4) provides, "public signs, signs for hospital or emergency services, legal notices, railroad signs and danger signs" must comply with the Sign Code, but need not be subject to the City's permit and fee process. Plaintiffs insist that the limited exemptions of section 47.06.205(4) render the Sign Code content based because the City is expressing a preference for certain types of speech. We disagree.

[12] The City interprets these provisions as providing exemptions to certain speakers and not to particular content.

---

[9]We do not understand plaintiffs as challenging the speaker-based exemptions of LOC § 47.06.205(4) on equal protection grounds. *Cf. Foti*, 146 F.3d at 637-38 (refusing to address whether a picketing and sign ordinance that granted an exemption for government speech violated equal protection because plaintiffs failed to present these arguments to the district court).

*See G.K. Ltd. Travel I*, 2004 U.S. Dist. LEXIS 6984 at *16; *see also* LOC § 47.03.015 (defining public signs as "a sign erected and maintained by a public agency within the right-of-way of a street or alley"). Like the district court, we hold this construction to be reasonable.[10]

The Supreme Court in *Turner Broad. Sys., Inc. v. FCC* stated

> [S]peaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say) . . . . [L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.

512 U.S. at 658. In this case, the Sign Code reflects the City's preference for not subjecting certain entities — public agencies, hospitals and railroad companies — to the requirements of the permitting and fee scheme.[11] The exemptions are purely

---

[10]In evaluating § 47.06.205(4) of the Sign Code, the district court found that exempting legal notices and danger signs from the permit and fee requirements of the Code was constitutionally impermissible. The district court reasoned that there are no obvious owners for *legal notices* or *danger signs* (as opposed to hospital or railroad signs) and the City's limiting construction was therefore inapplicable. The court ordered these subsections severed from the ordinance, relying on *Desert Outdoor Adver.* where we concluded that exemptions in a sign ordinance for "official notices" and "warning" signs were content based. *See G.K. Ltd. Travel I*, 2004 U.S. Dist. LEXIS 6984 at *18 (citing *Desert Outdoor Adver.*, 103 F.3d at 820). The City has not appealed the district court's ruling and we do not rule on the constitutionality of the severed exemptions.

[11]We have previously questioned the constitutionality of a "wholesale exemption for government speech," but we do not read Lake Oswego's Sign Code to provide such an exemption. *See Foti*, 146 F.3d at 637. Rather, the public agency exemption applies only to the permitting scheme; public agencies are otherwise required to follow the substantive requirements of the Sign Code. *See* LOC § 47.06.205 ("The following

speaker based according to the City's reasonable construction of the provision and say nothing of the City's preference for the content of these speakers' messages, nor do they allow the City to discriminate against disfavored speech. That is, plaintiffs have not shown that the City preferred the substance of railroad company messages, for instance, over travel agency messages and therefore exempted the railroad companies from the permitting process. *See One World One Family Now v. City & County of Honolulu*, 76 F.3d 1009, 1012 n.5 (9th Cir. 1996) ("Because [the] exemptions don't enable the city to discriminate against ideas it disfavors, they don't render the ordinance content-based."). Moreover, these institutional speakers are still subject to the mandates of the Sign Code concerning the type, number and characteristics of signs that are permissible in the City; it is just that certain speakers need not obtain permits (and pay the associated fee) before posting their signs. That the law affects plaintiffs more than other speakers does not, in itself, make the law content based. *See Ward*, 491 U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.").

b.  *Event-based exemptions*

**[13]** Likewise, the permit exemption for temporary signs in residential zones is not content based. Indeed, the provision creating this exemption explicitly demands content neutrality. *See* LOC § 47.08.300(B)(1) ("In any residential zone temporary signage shall be allowed for each and every lot. This signage *shall not be restricted by content*, but is usually and

---

signs shall comply with all provisions and regulations of this chapter; However [sic], no fee, permit or application is required."). Furthermore, the exemption here for public signs is more narrowly drawn because the Code exempts only those signs "erected and maintained by a public agency within the right-of-way of a street or alley." LOC § 47.03.015.

customarily used to advertise real estate sales, political or ideological positions, garage sales, home construction or remodeling, etc.") (emphasis added). Section 47.08.300(B) imposes only temporal and size restrictions on temporary signs. For example, homeowners may erect a temporary sign concerning any topic whatsoever on their property without a permit so long as that sign goes up not more than 90 days prior to an election, stays up not more than five days following the election and is no larger than six square feet. *See* LOC § 47.08.300(B)(1)(a). Likewise, a homeowner may put up "[o]ne temporary sign not exceeding six square feet provided the sign is removed within fifteen days from the sale, lease or rental of the property or within seven days of completion of any construction or remodeling." LOC § 47.08.300(B)(1)(b). Such exemptions indicate the City's recognition that during certain times, more speech is demanded by the citizenry because of the event (e.g., a real estate transaction or election) but the City does not limit the substance of this speech in any way. The exemption for temporary signs does not manifest the City's desire to prefer certain types of speech or regulate signage by its content. Therefore, this exemption, too, is content neutral.

Neither the speaker- nor event-based exemptions implicate *Foti* insofar as neither requires law enforcement officers to "read a sign's message to determine if the sign is exempted from the ordinance." *Foti*, 146 F.3d at 636. In the speaker category, officers decide whether an exemption applies by identifying the entity speaking through the sign without regard for the actual substance of the message. In the case of event-based exemptions to the permitting process, the officer must determine only whether a specific triggering event has occurred and if the temporary sign has been erected within the specified time frame. Plainly, the City anticipates that signs will relate to the triggering event, but the ordinance, by its own terms, does not mandate the temporary sign comply with content restrictions. Although it may seem "bizarre" to plaintiffs to read the ordinance as allowing temporary signs,

regardless of content, during certain events, this is precisely what the ordinance says and it reveals the extent the City is willing to go to avoid content-based restrictions on expression. *See G.K. Ltd. Travel I*, 2004 U.S. Dist. LEXIS 6984 at *21.

### 2. *Grandfather clause*

Plaintiffs argue that the Sign Code's grandfather clause, LOC § 47.04.100(1), is content based under *Foti* because, in order to evaluate whether the pre-existing sign must now conform to the Code, the City official must "read [the] sign's message" and determine whether there has been a "change of logo and/or message upon the face" of the sign or if the sign has otherwise been altered.[12] *See Foti*, 146 F.3d at 636; LOC § 47.03.015 (defining "change of copy"). Plaintiffs attempt to broaden *Foti* to stand for the proposition that any time an ordinance requires a law enforcement officer to read a sign, the ordinance must be content based. We reject such an expansive reading. The *Foti* test actually turns on "whether the ordinance singles out certain speech for differential treatment based on the idea expressed," *id.* at 636 n.7; enforcement officials having to read a sign is persuasive evidence of such a purpose but may not always be dispositive.

In *Foti*, we evaluated a Menlo Park ordinance banning all signs on all public property. The law, however, exempted "open house," safety, traffic and public information signs. Relying on our earlier ruling in *Desert Outdoor Adver. v. City of Moreno Valley*, 103 F.3d 814, 820 (9th Cir. 1996), we concluded that these exemptions were content based "because a law enforcement officer must read a sign's message to determine if the sign is exempted from the ordinance." *Foti*, 146 F.3d at 636. Menlo Park was clearly expressing a preference

---

[12]In regards to pole signs, the Code's grandfather clause lapsed as of May 21, 2004. *See* LOC § 47.04.100(5). In regards to other types of signs, however, the grandfather clause remains in force.

for certain types of signs by exempting them from the city's general prohibition. The only way to determine if a sign was the type qualified to receive Menlo Park's favorable treatment was to evaluate the content and substantive message of the sign.

**[14]** Unlike in Menlo Park, here, City officials have to read signs only to determine whether the text of the sign or a logo on the sign has changed — i.e., whether it is a verbatim replication of the original text or an exact duplication of the previous logo. As the City notes, even those who speak no English could perform this superficial review function by placing the former sign next to the new sign and examining the characters and elements on both. Unlike *Foti*'s exemptions, the grandfather clause does not require Lake Oswego officials to evaluate the substantive message on the preexisting sign and the clause certainly does not favor speech "based on the idea expressed." *Id.* at 636 n.7. A grandfather provision requiring an officer to read a sign's message for no other purpose than to determine if the text or logo has changed, making the sign now subject to the City's regulations, is not content based. *See Hill v. Colorado*, 530 U.S. 703, 720 (2000) ("We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct.").

### 3.  *Design review provision*

**[15]** Section 47.06.200(5) allows City officials, during the permitting process, to review signs for "clarity and readability." Plaintiffs suggest that this provision allows City officials to prefer certain speech and regulate all messages on the basis of content. The City counters by offering a limiting construction, asserting that clarity and readability refer only to *legibility* and not intelligibility. *G.K. Ltd. Travel I*, 2004 U.S. Dist. LEXIS 6984 at *22. Without the City's construction, the provision would be suspect; however, we consider the City's limiting construction reasonable. *See Village of Hoffman Estates*

*v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982) ("In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered."). Review for legibility entails, for example, an official reading a sign to ensure that its text is visible from streets so as not to distract passing motorists. Legibility review does not allow the City to regulate the substance of the message contained in a sign. We hold that the design review provision, as limited by the City's construction, is content neutral.

### B.   Remaining *Ward* Factors

#### 1.   *Significant interest*

**[16]** The Sign Code, in total, is a content-neutral regulation of speech. We must still determine whether the Code is narrowly tailored to achieve significant government interests and leaves open ample alternative channels for communication. As explained in our discussion of the pole sign regulation, part II.B *supra*, the City's interests in regulating speech to preserve aesthetics and protect traffic and traveler safety are significant.

#### 2.   *Narrow tailoring*

**[17]** We have already concluded that the pole sign restriction is narrowly tailored and similarly conclude that the remainder of the Sign Code's regulations are narrowly tailored to achieve the City's significant interests. The City's regulations, limiting the type, size and number of signs permissible within its borders, are "reasonable legislative judgments in light of the City's concern[s] . . . ." *Foti*, 146 F.3d at 641.[13] For example, pole signs and internally illuminated signs may distract travelers as they are driving down the

---

[13]Further evidence of the City's desire to tailor the Sign Code is found in the Code's variance procedure. City officials may grant a variance so a party can avoid the strictures of the Code where "[s]trict application of the [C]ode requirement would deny the applicant a reasonable opportunity to communicate by sign in a manner similar to like persons or uses because of an unusual or unique circumstance . . . ." LOC § 47.12.500(2)(A).

City's streets, posing a hazard to traffic safety. *See id.* ("A fifteen square foot sign carried by a protester on a public sidewalk, when compared to a three square foot sign, may block drivers' views of road signs and traffic conditions, intimidate pedestrians, and obstruct the safe and convenient circulation of pedestrians on the sidewalk.") Additionally, the proliferation of temporary signs in the City's residential zones may create visual clutter and otherwise distract from the City's neat and orderly appearance. Without these restrictions, it is difficult to imagine how the City would achieve its goals of preserving aesthetics and protecting traffic safety. "Here, no less restrictive means of accomplishing the government's objectives is readily apparent." *Bland*, 88 F.3d at 736; *see also Ward*, 491 U.S. at 799 ("[T]he requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.") (internal citation and quotation marks omitted).

### 3.  *Ample alternative channels*

**[18]** In *Taxpayers for Vincent*, the Supreme Court evaluated a severely restrictive Los Angeles ordinance prohibiting the posting of signs on public property. 466 U.S. 789 (1984). The Court upheld this prohibition as a valid, content-neutral time, place or manner restriction. In its discussion of the availability of ample alternative channels for communication, the Court noted,

> The Los Angeles ordinance does not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs on public property is prohibited. To the extent that the posting of signs on public property has advantages over these forms of expression, there is no reason to believe that these same advantages cannot be obtained through other means. To the contrary, the findings of the District Court indi-

cate that there are ample alternative modes of com-
munication in Los Angeles. Notwithstanding
appellees' general assertions in their brief concern-
ing the utility of political posters, nothing in the
findings indicates that the posting of political posters
on public property is a uniquely valuable or impor-
tant mode of communication, or that appellees' abil-
ity to communicate effectively is threatened by ever-
increasing restrictions on expression.

*Id.* at 812 (internal citation omitted). Similarly, the Sign Code,
although significantly restricting pole signs and regulating the
type and manner of other signs, does not threaten the ability
of Lake Oswego residents to "communicate effectively." Res-
idents of the City may resort to any number of alternative
channels for communication; indeed, the Code does not pro-
hibit residents from communicating through signs so long as
those signs otherwise comply with the Code's restrictions.[14]

**[19]** We hold that the Sign Code is a valid content-neutral
restriction on the time, place or manner of speech, narrowly
tailored to serve the City's significant interests without imper-
missibly limiting the alternative channels for communication.
"[T]he ordinance does not create an unacceptable threat to the
'profound national commitment to the principle that debate on
public issues should be uninhibited, robust, and wide-open.' "
*Id.* at 817 (citing *New York Times Co. v. Sullivan*, 376 U.S.
254, 270 (1964)).

## IV.   Commercial/Noncommercial Speech Distinction

**[20]** "[A]n ordinance is invalid if it imposes greater restric-
tions on noncommercial than on commercial billboards or

---

[14]Several sections of the Code list allowable signs (subject to the City's
permitting process), including, in various zones, blade, cornice, awning,
monument, window and canopy signs. *See* LOC §§ 47.10.410(D),
47.10.412(1), 47.10.415, 47.10.420.

regulates noncommercial billboards based on their content." *Nat'l Adver. Co. v. City of Orange*, 861 F.2d 246, 248 (9th Cir. 1988) (citing *Metromedia*, 453 U.S. at 513, 516). Plaintiffs claim that various subsections of section 47.08.300, regulating temporary signs in residential zones, violate *Metromedia*'s rule. Section 47.08.300 contains a list of events (e.g., an election or the sale, lease or rental of a property), the occurrence of which allows a resident to erect a temporary sign, not exceeding listed dimensions, for a limited time period. The City states that temporary signs need not concern a specific, enumerated topic, such as the sale of property, but can be about any subject matter so long as the sign is displayed during the relevant time period and is within the Code's size limits.

**[21]** The sections challenged do not indicate the City's preference for commercial speech nor do they regulate based on the content of speech. *See* LOC § 47.08.300(B)(1) ("This signage shall not be restricted by content . . . ."). Rather, the regulations exempt signs from the Code's permit requirement during certain events. For example, 90 days prior to an election and five days afterwards, a resident may erect a temporary sign not exceeding six square feet without a permit. § 47.08.300 (B)(1)(a). The City insists that the temporary sign could contain a purely commercial message so long as it meets the Code's temporal and size limitations. The district court was convinced by the City's argument, stating, "it is a fair reading of the provisions and demonstrates the lengths to which the City has gone to regulate signs without doing so on the basis of content." *G.K. Ltd. Travel I*, 2004 U.S. Dist. LEXIS 6984 at *21. The fact that no officer must read the temporary sign's message to determine if it falls into the Code's permit exemption further evidences the content neutrality of the temporary sign provision. *See Nat'l Adver. Co.*, 861 F.2d at 248.

**[22]** We are similarly convinced that section 47.08.300 does not impermissibly favor commercial over noncommer-

cial messages, nor does it regulate noncommercial messages on the basis of content. Where, as here, the Code is "neutral with respect to noncommercial messages," the *Metromedia* concern about cities distinguishing between myriad communicative interests is not implicated. *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 814 (9th Cir. 2003); *see also Metromedia*, 453 U.S. at 514.

## V.   Prior Restraint

Plaintiffs contend that the permitting requirement of section 47.10.400 is an unconstitutional prior restraint on speech. That section provides:

> It is unlawful and a civil violation for any person to erect, construct, alter or relocate any sign without first obtaining a permit pursuant to the provisions of this chapter unless a provision of this chapter specifically exempts a sign from the permit requirement.

LOC § 47.10.400(1). The City acknowledges that the review authorized by the permitting scheme authorizes "some discretion," but asserts that City officials are not reviewing signs based on content. Plaintiffs attack the City's permitting scheme on two grounds: first, it does not contain adequate procedural protections for speakers and, second, it gives unbridled discretion to local law enforcement officials.

### A.   Procedures

**[23]** Generally, prior restraints are constitutionally suspect and may stand only if they are imposed for a short period of time and provide a process for adequate and swift appeal to a judicial body. *See Freedman v. Maryland*, 380 U.S. 51, 57-59 (1965). In *Freedman*, the Court evaluated a film review procedure whereby a state law required a film exhibitor to submit his film to a censor prior to having it displayed at a local theater. The Court held that such a review process sur-

vives constitutional scrutiny only if the system incorporates "procedural safeguards designed to obviate the dangers of a censorship system." *Id.* at 58. Plaintiffs argue that the Sign Code does not satisfy the *Freedman* dictate because the Code's permitting scheme fails to contain necessary procedural safeguards such as a process for swift appeal to a judicial body. However, in *Thomas v. Chicago Park District*, the Court evaluated a content-neutral licensing scheme that was challenged under the *Freedman* prior restraint doctrine and concluded, "*Freedman* is inapposite because the licensing scheme at issue here is not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum." 534 U.S. 316, 322 (2002); *accord S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1138 (9th Cir. 2004) (a permitting scheme requiring permits even for private gatherings did not violate *Freedman* "because it is content-neutral, [and therefore] the Act need not contain the procedural safeguards required of content-based regulations."). Likewise, because we have held that the Sign Code is content neutral, the procedural requirements of the prior restraint doctrine need not be satisfied. *Id.* at 1137 ("[N]one of the *Freedman* safeguards are required of content-neutral time, place, and manner permit schemes.") (quoting *Thomas*, 534 U.S. at 320-23).

### B.    Unbridled Discretion

**[24]** The prior restraint doctrine requires review of both the law's procedural guarantees and the discretion given to law enforcement officials. Even though content-neutral laws need not incorporate the strict procedural guarantees of *Freedman*, they must avoid placing unbridled discretion in the hands of government officials. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26 (1990). The requirement of sufficient direction for City officials seeks to alleviate the threat of content-based, discriminatory enforcement that arises "[w]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit . . . ." *Chicago Park*

*Dist.*, 534 U.S. at 323. To avoid impermissible discretion, the challenged ordinance should "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Id.*

The Code requires most who seek to speak through the medium of a sign to obtain a permit from a City official. *See* LOC § 47.10.400. The plaintiffs argue that this permit process, authorizing City officials to review signs for compatibility, LOC § 47.06.200(4), fails to contain the standards demanded in *Chicago Park District* and thus renders the Code an unlawful prior restraint.[15] Plaintiffs believe that there are few, if any, limits on the discretion of permitting officials so the officials may reject signs merely because they do not like the message conveyed or the speaker. We disagree.

The City may deny permits only when the sign does not comport with the Code's reasonably specific size and type criteria or is not compatible with the surrounding environment. Both reference to the surrounding environment and the "compatibility" determination are explicitly defined in the Code. Officials are to look only to the proposed sign's relationship "with other nearby signs, other elements of street and site furniture and with adjacent structures." *Id.* In determining whether the sign is compatible, the Code instructs permitting officials to consider a limited and objective set of criteria, namely "form, proportion, scale, color, materials, surface treatment, overall sign size and the size and style of lettering." *Id.* Additionally, the Code requires that most permit applications be processed within 14 days of receipt of the application, instructs applicants what to include in the application and allows for appeal to the City Council. *See* LOC

---

[15]Section 47.06.200(4) provides that signs must "be compatible with other nearby signs, other elements of street and site furniture and with adjacent structures. Compatibility shall be determined by the relationships of the elements of form, proportion, scale, color, materials, surface treatment, overall sign size and the size and style of lettering."

§ 47.10.400; *see also Chicago Park Dist.*, 534 U.S. at 324 (favorably noting that the Park District must respond to a permit application within 28 days). General provisions of the City of Lake Oswego Code also require that the permitting official state the reasons for his or her decision to either grant or deny a permit so as to facilitate effective review of the official's determination. *See* LOC § 50.81.015 (2005) ("Approval or denial of a [minor development permit] application shall be accompanied by written findings that explain the criteria and standards considered relevant to the decision, state the facts relied upon in rendering the decision and explain the justification for the decision based on the criteria, standards and facts set forth."); *cf. City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 769 (1988) (holding unconstitutional a newsrack permitting ordinance in part because "nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application."). Requiring the articulation of reasons ensures that the compatibility determination is properly limited in scope and allows the Sign Code to be "enforceable on review." *Chicago Park Dist.*, 534 U.S. at 324; *see also S. Or. Barter Fair*, 372 F.3d at 1140 ("These limits objectively constrain the governing body's discretion and allow effective judicial review.").

**[25]** This case is distinguishable from *Desert Outdoor Adver. v. City of Moreno Valley* where we invalidated as an unlawful prior restraint an ordinance requiring residents to obtain permits prior to installing off-site signs. 103 F.3d at 818-19. The permitting official made determinations upon finding that the proposed display "will not have a harmful effect upon the health or welfare of the general public . . . and will not be detrimental to the aesthetic quality of the community or the surrounding land uses." *Id.* at 817. In concluding that the ordinance impermissibly vested unbridled discretion in the hands of local officials, we stated "[The ordinance] contains no limits on the authority of City officials to deny a permit . . . . Moreover, City officials can deny a permit with-

out offering any evidence to support the conclusion that a particular structure or sign is detrimental to the community." *Id.* at 819. In Lake Oswego, however, the standard governing compatibility review is much more specific — "compatibility shall be determined by the relationship of . . ." — than mere reference to "the aesthetic quality of the community or surrounding land uses." And, as already noted, Lake Oswego permitting officials must explain why the sign is incompatible and therefore not worthy of a permit. We are satisfied that the Sign Code contains appropriate standards "cabining the administrator's discretion." *S. Or. Barter Fair*, 372 F.3d at 1140.

**[26]** Plaintiffs also complain that the Code's design review clause is so subjective that permitting officials are allowed to censor expression. However, plaintiffs fail to point to any section of the Code giving officials the discretion to restrict signs by content. Plaintiffs are unable to identify a single case of actual censorship of content by the permitting authority. *See S. Or. Barter Fair*, 372 F.3d at 1140 (in rejecting unbridled discretion claim, we noted, "we lack actual evidence of a pattern of abuse."); *cf. City of Lakewood*, 486 U.S. at 758. In almost all instances, the parties have been able to come to resolution regarding the compatibility issues raised by the permitting official.[16] Sometimes, as plaintiffs identify, the dialogue with the City breeds resentment or frustration on the part of the permit seeker as businesses do not want to negotiate their sign design with the City. Nonetheless, frustration of those who are regulated by the Sign Code is not sufficient evidence that the regulators are granted unbridled discretion. Absent evidence of government abuse, we are unwilling to conclude that the Code operates as an unlawful prior restraint. "[W]e think that this abuse [of the permitting process] must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that

---

[16]In only one case did an applicant appeal the denial of a permit and this appeal ended favorably for the applicant.

is found in few legal arrangements." *Chicago Park Dist.*, 534 U.S. at 325. *See also S. Or. Barter Fair*, 372 F.3d at 1139 ("Should abuse occur, it may be remedied adequately through as-applied challenges like the Fair's § 1983 claim.").

The City's permitting scheme includes standards that "are reasonably specific and objective, and do not leave the decision to the whim of the [permitting official]." *Chicago Park Dist.*, 534 U.S. at 324 (internal citation and quotation marks omitted). Although the design review criteria are somewhat elastic and require reasonable discretion to be exercised by the permitting authority, this alone does not make the Sign Code an unconstitutional prior restraint. *See Ward*, 491 U.S. at 794 ("While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.").

## VI.   Vagueness

**[27]** A government regulation may be unconstitutionally vague for two reasons. First, the regulation may fail to give persons of ordinary intelligence adequate notice of what conduct is proscribed; second, it may permit or authorize "arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "[T]hese vagueness concerns are more acute when a law implicates First Amendment rights and, therefore, vagueness scrutiny is more stringent." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001).

Plaintiffs contend that the Sign Code is unconstitutionally vague, but fail to point to specific provisions of the Code that are suspect. They focus most of their energy arguing that the Code does not notify the citizenry of what conduct is prohibited. To support their claim, plaintiffs again identify state-

ments from City residents expressing frustration with the City's design review policy.

**[28]** The Sign Code appears quite clearly to describe what conduct is permitted in the City. The Code provides explicit sign size and type requirements. *See*, *e.g.*, LOC §§ 47.04.115, 47.08.300. For example, a business, like G.K., that seeks to put up a pole sign is adequately aware, through the text of the Code itself, that it generally may not do so without an exemption (granted only in limited circumstances), LOC § 47.10.410(D), or a variance, LOC § 47.12.500. The Code states which signs are exempt from permitting. For example, a resident seeking to place a sign on her property during elections knows that so long as the sign is within certain dimensions, she may do so without a permit. The Code offers a thorough and precise list of definitions for the various types of signs. *See* LOC § 47.03.015. And the Code requires most parties to obtain a permit prior to erecting a sign, thereby preventing unexpected citations. Thus, "it is clear what the ordinance, as a whole, prohibits." *Hill*, 530 U.S. at 733.

In addition to providing notice of what conduct is punishable, the clarity of the Code's proscriptions avoids the fear of arbitrary and discriminatory enforcement. City officials may not punish sign owners simply for displaying a message with which they disagree — the sign must violate one of the specific provisions of the Code. Similarly, the City will punish those who allow temporary signs to remain on their property more than five days following an election (unless some other exemption applies). *See* LOC § 47.08.300(B)(1). City officials are to enforce the Code as it is written and the City provides sufficient guidance in the Code's numerous sections to avoid "delegat[ing] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis. . . ." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

With respect to the Code's permitting process, which we have already held is not an invalid prior restraint, there is

admittedly an element of subjectivity to the determination of "compatibility." LOC § 47.06.200(4). However, this subjectivity, alone, does not render the Code unconstitutionally vague. The City is not obligated to provide numerical or otherwise technical definitions of the bounds of compatibility. *See Grayned*, 408 U.S. at 110 ("Condemned to the use of words, we can never expect mathematical certainty from our language."). Furthermore, the impreciseness of compatibility is mitigated by the clarity of the rest of the design review section directing officials to determine compatibility with reference to form, color, shape, size, etc. LOC § 47.06.200(4); *see Gammoh v. City of La Habra*, 395 F.3d 1114, 1120 (9th Cir. 2005) ("[O]therwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity.").

**[29]** Plaintiffs would have us invalidate the entire Code because of the reasonable subjectivity of the design review process. We will not do so. "Vagueness doctrine cannot be understood in a manner that prohibits governments from addressing problems that are difficult to define in objective terms." *Id.* at 1121. *See also Cal. Teachers Ass'n*, 271 F.3d at 1151 ("[E]ven when a law implicates First Amendment rights, the constitution must tolerate a certain amount of vagueness."). The Sign Code is not unconstitutionally vague.

The district court's grant of summary judgment in favor of the City is AFFIRMED.