**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CLYDE REED, Pastor and GOOD NEWS COMMUNITY CHURCH, *Plaintiffs-Appellants*, <br><br> v. <br><br> TOWN OF GILBERT, ARIZONA and ADAM ADAMS, in his official capacity as Code Compliance Manager, *Defendants-Appellees*. | No. 11-15588 <br><br> D.C. No. 2:07-cv-00522-SRB <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
August 10, 2012—San Francisco, California

Filed February 8, 2013

Before: Consuelo M. Callahan and Paul J. Watford, Circuit
Judges, and James K. Singleton, Senior District Judge.[*]

Opinion by Judge Callahan;
Dissent by Judge Watford

---

[*] The Honorable James K. Singleton, Senior District Judge for the U.S. District Court for Alaska, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's summary judgment, on remand from the Ninth Circuit, in an action brought by Good News Community Church and its pastor alleging that the Town of Gilbert's sign ordinance, which restricted the size, duration and location of temporary directional signs, was unconstitutional because it favored some noncommercial speech over other noncommercial speech.

Accepting the prior opinion in *Reed v. Town of Gilbert*, 587 F.3d 966 (9th Cir. 2009), as law of the case, the panel concluded that the sign ordinance was constitutional because the different treatment of types of noncommercial temporary signs was not content-based as that term was defined in *Reed,* and the restrictions were tailored to serve significant governmental interests. The panel also concluded that the ordinance did not violate Good News' (or its members') right to the free exercise of religion or right to equal protection of law, and was not unconstitutionally vague or overbroad. In addition, the panel determined that the amendments to the sign ordinance made by the Town of Gilbert during the pendency of the appeal did not moot the case and that Good News could file a new action in the district court should it wish to challenge the new provisions of the sign ordinance.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting, Judge Watford agreed with the majority that the post-judgment amendments to the Town of Gilbert's sign ordinance did not render this appeal moot. Judge Watford disagreed with the majority's conclusion that the sign ordinance was constitutional, and would hold that the ordinance violated the First and Fourteenth Amendments by drawing content-based distinctions among different categories of non-commercial speech.

**COUNSEL**

Jeremy D. Tedesco (argued), Scottsdale, Arizona, and David A. Cortman, Lawrenceville, Georgia, for Plaintiffs-Appellants.

Robert Grasso, Jr., Kim S. Alvarado (argued), and Jenny J. Winkler, Grasso Law Firm, P.C., Chandler, Arizona, for Defendants-Appellees.

**OPINION**

CALLAHAN, Circuit Judge:

Good News Community Church and its pastor, Clyde Reed (referred to collectively as "Good News"), appeal from the district court's determination on remand from the Ninth Circuit that the Town of Gilbert's ordinance that restricts the size, duration and location of temporary directional signs does not discriminate between different forms of noncommercial speech in a unconstitutional manner. In *Reed v. Town of Gilbert*, 587 F.3d 966 (9th Cir. 2009), we held that the ordinance (sometimes referred to as the "Sign Code") is

not a content-based regulation and is a reasonable time, place and manner restriction. However, we remanded the case to the district court "to consider the First Amendment and Equal Protection claims that the Sign Code is unconstitutional in favoring some noncommercial speech over other noncommercial speech." *Id*. at 983.

Accepting our opinion in *Reed* as law of the case, we conclude that the Sign Code is constitutional because the different treatment of types of noncommercial temporary signs are not content-based as that term is defined in *Reed*, and the restrictions are tailored to serve significant governmental interests. In addition, we determine that the amendments to the Sign Code made by the Town of Gilbert ("Gilbert") during the pendency of this appeal do not moot this case and that Good News may file a new action in the district court should it wish to challenge the new provisions of the Sign Code.

**I**.

Good News is a relatively small church with 25 to 30 adult members and 4 to 10 children. "Members of Good News believe the Bible commands them to go and make disciples of all nations, and that they should carry out this command by reaching out to the community to meet together on a regular basis. To do so, they display signs announcing their services as an invitation for those in the community to attend." *Reed*, 587 F.3d at 971 (internal quotation marks omitted). Starting around 2002, Good News met at an elementary school in Gilbert. *Id*. It presently rents space at an elementary school in Chandler, Arizona, which borders Gilbert.

For a time, Good News placed about 17 signs in the area surrounding its place of worship in Gilbert announcing the time and location of its services. In 2005, Good News received an advisory notice from Gilbert that it was violating the town's sign ordinance because "the signs were displayed outside the statutorily-limited time period." For a while thereafter, Good News reduced the number of signs it erected and the amount of time its signs were in place, but friction with Gilbert persisted. *Reed*, 587 F.3d at 972. In March 2008, Good News filed suit in federal court in Arizona alleging that Gilbert's Sign Code violated the Free Speech Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. *Id.*

## A.  The Sign Ordinances

Like many municipalities, Gilbert regulates the display of outdoor signs. Gilbert Land Development Code, Division 4, General Regulations, Article 4.4 (the "Sign Code"). Section 4.401(A) outlines the purposes for the Sign Code, namely, to "assure proper and efficient expression through visual communications involving signs compatible with the character and environment of the Town; to eliminate confusing, distracting, and unsafe signs; and to enhance the visual environment of the Town of Gilbert."

Under § 4.402(A), no person may erect a sign without first obtaining a sign permit, unless the sign is one exempted under § 4.402(D). Section 4.402(D) lists nineteen different

types of signs that are allowed without a permit.[1]  Three of the types of exempted signs are of particular relevance: "Temporary Directional Signs Relating to Qualifying Event," "Political Signs," and "Ideological Signs."

Gilbert asserts, and Good News concedes, that Good News' signs are Temporary Directional Signs subject to the requirements of § 4.402(P).  This subsection provides that "Temporary Directional Signs Relating to a Qualifying Event . . . shall be no greater than 6 feet in height and 6 square feet in area," "shall only be displayed up to 12 hours before, during and 1 hour after the qualifying event ends," "may be located off-site and shall be placed at grade level," and "shall be placed only with the permission of the owner of the property on which they are placed."  Additional restrictions include that "[n]o more that 4 signs shall be displayed on a single property at any one time," and that Temporary

---

[1] The nineteen types of signs are:

> (1) Signs installed by a governmental jurisdiction; (2) Building Identification Signs; (3) Permanent Regulatory and Parking Signs; (4) Information Wall Signs (e.g., "Delivery Entrance"); (5) Real Estate Signs; (6) Residential Open House Signs; (7) Political Signs; (8) Ideological Signs; (9) Garage Sale Signs; (10) Business Identification Banners during street construction; (11) Interim Business Identification Banners; (12) Boutique Signs; (13) Window Signs; (14) A-Frame Signs; (15) Temporary Directional Signs Relating to a Qualifying Event; (16) Construction Signs; (17) Suspended Signs (particular type of commercial sign); (18) Restaurant Menu Signs; and (19) Required Street Addresses.

*Reed*, 587 F.3d at 972 n.2.

Directional Signs may not be placed "in a public right-of-way"[2] or on "fences, boulders, planters, other signs, vehicles, utility facilities, or any structure."

A "Political Sign" is defined as a "temporary sign which supports candidates for office or urges action on any other matter on the ballot of primary, general and special elections." Political Signs (a) may be up to 32 square feet in size, (b) may be erected any time prior to an election but must be taken down within 10 days of the election, (c) are not limited in number, and (d) may be placed in the public right-of-way. An "Ideological Sign" is a "sign communicating a message or ideas for noncommercial purposes that is not a construction sign, directional sign, temporary directional sign, temporary directional sign relating to a qualified event, political sign, garage sale sign, or sign owned or required by a governmental agency." Ideological Signs (a) may be up to 20 square feet in size, (b) are not limited in time, (c) are not limited in number, and (d) may be placed in the public right-of-way.

## B.  Initial Proceedings in the District Court

Gilbert initially stipulated to a preliminary injunction, but when Gilbert amended the Sign Code in a way that Good News believed continued to infringe on its constitutional rights, Good News filed a second motion for a preliminary injunction. In September 2008, the district court denied Good News' motion for an injunction, concluding that: (a) "§ 4.402(P) is a content-neutral regulation, and [] it passes the applicable intermediate level of scrutiny;" and (b) the Sign

---

[2] In October 2011, Gilbert amended the Sign Code to allow placement of Temporary Directional Signs within the public right-of-way.

Code "does not violate equal protection, as any uneven effects are an unintended consequence of the lawful content-neutral regulation." *Reed*, 587 F.3d at 973. Good News appealed to the Ninth Circuit.

**C.  *Reed v. Town of Gilbert*, 587 F.3d 966 (9th Cir. 2009)**

In November 2009 we basically affirmed the district court's denial of an injunction. In doing so, we made four determinations that guide our review in this appeal.

1.  *Good News alleges an as-applied challenge to the Sign Code*

First, we held that Good News' challenge was an as-applied challenge, and not a facial challenge, to the Sign Code. *Id*. at 974. We determined that Good News' attack on the ordinance was "basically a challenge to the ordinance as applied to [its] activities," and therefore we limited our analysis of the constitutionality of the ordinance to its application to Good News. *Id.*

2.  *The Sign Code is not a content-based regulation*

Second, after reviewing the evolution of our opinions from *Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998),to *Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005), and *G.K. Limited Travel v. City of Lake Oswego*, 436 F.3d 1064 (9th Cir. 2006) ("*G.K. Ltd.*"), we determined the fact that an enforcement official had to read a sign did not mean that a ordinance is content-based. Instead, we concluded that "our focus should be on determining whether the ordinance targets certain content; whether the ordinance

or exemption is based on identification of a speaker or event instead of on content; and whether an enforcement officer would need to distinguish content to determine applicability of the ordinance."[3]  *Reed*, 587 F.3d at 976.

Applying this focus to the Sign Code, we found that the ordinance "regulates physical characteristics, such as size, number and construction of the signs," their locations, and the timing of displays, none of which "implicate the content of speech."  *Id.* at 977.  We noted that "[t]he definition of a Qualifying Event sign merely encompasses the elements of 'who' is speaking and 'what event' is occurring."[4]  *Id.*  These two criteria invoke the speaker-based and event-based characteristics approved in *G.K. Ltd.* because "the City d[id] not limit the substance of [the] speech in any way."  *Id.*

---

[3] We quoted from *G.K. Ltd.*, 436 F.3d at 1078, that:

> Neither the speaker- nor event-based exemptions implicate *Foti* insofar as neither requires law enforcement officers to "read a sign's message to determine if the sign is exempted from the ordinance." *Foti*, 146 F.3d at 636. In the speaker category, officers decide whether an exemption applies by identifying the entity speaking through the sign without regard for the actual substance of the message. In the case of event-based exemptions . . . the officer must determine only whether a specific triggering event has occurred and if the temporary sign has been erected within the specified time frame.

*Reed*, 587 F.3d at 976.

[4] In *Reed* we used "Qualifying Event Sign" to refer to Temporary Directional Signs exempted by § 4.402(P) of the Sign Code. 587 F.3d at 972.

(quoting *G.K. Ltd.*, 436 F.3d at 1078).  We explained that this case:

> highlights the absurdity of construing the "officer must read it" test as a bellwether of content.  If applied without common sense, this principle would mean that every sign, except a blank sign, would be content based. While a Gilbert officer needs to briefly take in what is written on the Qualifying Event Sign to note who is speaking and the timing of the listed event, this "kind of cursory examination" is not akin to an officer synthesizing the expressive content of the sign.

*Reed*, 587 F.3d at 978.  We concluded "that § 4.402(P) is not a content-based regulation: It does not single out certain content for differential treatment, and in enforcing the provision an officer must merely note the content-neutral elements of who is speaking through the sign and whether and when an event is occurring."  *Id.* at 979.

### 3. *The Sign Code is narrowly tailored to further Gilbert's significant interests*

Third, we determined that the Sign Code, "as a content-neutral time, place and manner regulation," *id*. at 978, also had to be, and was, narrowly tailored.  Quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), we recognized that to be "narrowly tailored" the Sign Code had to "serve a significant governmental interest" and had to "leave open ample alternative channels for communication of that information."  *Reed*, 587 F.3d at 979.  We held that the

district court had not abused its discretion in concluding that the Sign Code "is narrowly tailored as it does not sweep in more speech than is necessary to achieve the Town's aesthetic and traffic objectives," 587 F.3d at 980, explaining:

> The restrictions on time, place and manner imposed by Gilbert on the display of Qualifying Events Signs would indeed appear to "actually advance" the aesthetic and safety interests by limiting the size, duration and proliferation of signs. *See G.K. Ltd.*, 436 F.3d at 1073. These measures restricting the number of signs and limiting them to private property do not appear substantially broader measures than required to make sure the rights-of-way are not so thicketed with signs as to pose a safety hazard or create an aesthetic blight. The limitation on timing – twelve hours before the event and one hour after – is equally narrowly tailored to meet these interests. While it might be easier and provide broader exposure for Good News to have the sign up for twenty-four hours, the test is not convenience or optimal display.

*Id*.

We also held that the district court did not abuse its discretion in finding that the Sign Code allowed for alternate channels of communications for Good News to communicate effectively with members of the public. *Id*. at 981. We explained that "[w]hile the alternative options identified by the district court may not be Good News' preference, 'we cannot invalidate the Sign Code merely because it restricts

plaintiffs' preferred method of communication.'" *Id*. (quoting *G.K. Ltd.*, 436 F.3d at 1074). We also noted that the alternative modes available did not appear to be especially burdensome. *Id.*

This section of *Reed* concludes with the affirmative statement that:

> Section 4.402(P) is a content-neutral regulation of the time, place and manner of display of Good News' Qualifying Event Signs; the provision is narrowly tailored to further Gilbert's significant interests in aesthetics and traffic safety; and Good News has ample alternative channels of communicating its invitation to church services.

*Id*.

4. *The Sign Code does not favor commercial over noncommercial speech*

The fourth relevant holding in *Reed* is our determination that the district court "did not abuse its discretion in concluding, after close examination, that the Sign Code does not favor commercial speech over non-commercial speech."[5]

---

[5] We explained:

> The district court concluded, however, that Good News' "noncommercial speech enjoys fewer restrictions than its commercial counterparts." The court performed a careful comparison of the restrictions placed on Qualifying Event Signs versus "Weekend

*Id*. at 982.  Our opinion in *Reed* remanded on a limited issue only: "to consider the First Amendment and Equal Protection claims that the Sign Code is unconstitutional in favoring some noncommercial speech over other noncommercial speech." *Id*. at 983.  We noted that "[o]n remand, the district court will have the opportunity to determine whether Gilbert impermissibly 'evaluate[d] the strength of, or distinguished between, various [noncommercial] communicative interests.'" *Id*. at 983 (quoting *Metromedia Inc. v. City of San Diego*, 453 U.S. 490, 514 (1981)).

## D.  Proceedings on Remand in the District Court

On remand, the parties agreed to submit the case on cross-motions for summary judgment.  The district court's order set forth three preliminary determinations.  First, based in part on our opinion in *Reed*, the court held that the Sign Code "is a content-neutral regulation of speech that seeks to identify who is speaking and what event is occurring and does not

---

> Directional Signs" for subdivision sales, the commercial speech showcased by Good News as receiving more favorable treatment.  The district court concluded that Qualifying Event Signs come out on top as the total number of Qualifying Event Signs allowed is greater; Qualifying Event Signs may be placed during week-days as well as weekends; the size allowed for Qualifying Events Signs is greater; and although the Qualifying Events Signs may not be placed in rights-of-way, they are not restricted to a two-mile radius from the event.  Of "paramount importance" to the court was the fact that no permit is required to display a Qualifying Events Sign, in contrast to the permit required for the Weekend Directional Signs.

*Id*. at 981–82 (footnote omitted).

discriminate on the basis of content." Second, citing its preliminary injunction order, the district court reiterated that the Sign Code was narrowly tailored to serve significant government interests. Third, the court embraced as a non-preliminary finding its determination that noncommercial speech is more favorably treated than commercial speech.

Addressing the remanded issue, the district court thought that the different treatments of various forms of noncommercial speech were "akin to the regulation at issue in *G.K. Ltd*." The district court reasoned:

> Both Political Signs and Qualifying Event Signs relate, in substance, to events – an election or a specified event fitting the definition in the Sign Code. In the case of Political Signs, the event is of widespread interest and takes place at a fixed, regular interval. A Qualified Event might take place once, or it might take place several times a week, depending on the type of event. A Qualifying Event Sign could invoke so-called "core" speech, but Political Signs are always core speech. . . . To distinguish between a Political Sign and a Qualifying Event Sign, an officer need only skim the sign to determine the speaker (e.g. is a non-profit speaking?) and the event at issue (e.g. does this relate to an election or a Qualifying Event?). In *G.K. Ltd.*, the court concluded that speaker – and – event based exemptions did not render a sign regulation content-based because the municipality was distinguishing on the basis of the speaker's identity and whether a

triggering event had occurred, *not* on the basis of the sign's content.

. . . .

Ideological Signs are not tied to a specific event, the way Political and Qualifying Event Signs are, so they are not subject to an event-based time restriction under the Sign Code. This accounts for the different "time" restriction for Ideological Signs. As for place, namely whether a particular type of sign can be placed in the right-of-way, Gilbert argues that it has made a municipal decision to limit the overall number of signs in the right-of-way, and it does not discriminate at all among Ideological Signs. . . . Nonetheless, the Court finds that the Sign Code does not distinguish on the basis of the message of the sign because, other than signs relating to events – whether those events are elections or bake sales – the Sign Code treats all messages on equal footing. Because Ideological Signs do not relate to an event, they are distinguishable from Qualifying Event Signs. To determine whether a sign is an Ideological Sign or a Qualifying Event Sign, an officer does not need to read the content: he or she need only look to see whether the sign concerns an event.

After determining that the Sign Code did not discriminate among types of noncommercial speech, the district court rejected Good News' argument that the Sign Code was

impermissibly vague and overbroad.  Citing *United States v. Williams*, 553 U.S. 285, 304 (2008), the district court commented that the "[v]agueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment," and that a statute is void if it does not "provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement. The district court determined that the deterrent effect of the Sign Code was "insubstantial and remote" as the "ordinance provides plenty of guidance for people of ordinary intelligence to determine what conduct is permitted and prohibited, and does not foster arbitrary, capricious, or discriminatory enforcement."[6]

**E.  Gilbert's Motion to Dismiss**

Good News filed this appeal from the district court's entry of summary judgment in favor of Gilbert.  However, in October 2011, while the appeal was pending, Gilbert made two amendments to its Sign Code: (1) it allowed placement of Temporary Directional Signs within the public right-of-way; and (2) it limited the Temporary Directional Sign exemption to events held within the Town of Gilbert.[7]  Based

---

[6] The district court discounted Good News' reliance on Gilbert's officials' responses in depositions to hypothetical situations concerning signs that had both political and ideological information because the officials said that they had never seen such a sign.

[7] Section § 4.402(P)(4) and (5) now read, with the added language in capitals and the omitted language cross-out, as follows:

> 4.  *Location*.  Temporary Directional Signs Relating to
> a Qualifying Event may be located off-site and shall be

on the amended Sign Code, Gilbert filed a motion to dismiss this appeal, arguing that because Good News held its services outside of Gilbert, it does not qualify for the Temporary Directional Sign exemption, and lacks standing to pursue this appeal.

The motion to dismiss presents a situation analogous to that before the Supreme Court in *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993). In *Northeastern Florida*, the plaintiffs challenged a city ordinance providing preferential treatment to certain minority owned businesses for city contracts. *Id*. at 658. The district court granted the plaintiffs summary judgment, holding that the ordinance was unconstitutional, but the Eleventh Circuit vacated that order finding that the plaintiffs lacked standing. *Id*. at 660. Shortly after the Supreme Court granted certiorari, the city repealed the questioned ordinance and replaced it with new ordinance that provided for a more narrow minority preference. *Id*. at

---

placed at grade level. Signs MAY BE PLACED IN THE RIGHT-OF-WAY OR, WITH PERMISSION OF THE PRIVATE PROPERTY OWNER, ON PRIVATE PROPERTY shall be placed only with the permission of the owner of the property on which they are placed. SIGNS SHALL RELATE ONLY TO EVENTS OCCURRING WITHIN THE TOWN.

5. *Prohibited Locations*. Temporary Directional Signs Relating to a Qualifying Event shall not be located:

a. In the public right of way.

b.a. On fences, boulders, planters, other signs, vehicles, utility facilities or any structure.

660–61.  The city then filed a motion to dismiss the case as moot.

Justice Thomas, writing for the Court, held that the case was not moot.  He relied on the Court's "well settled rule" set forth in *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982), that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Northeastern Florida*, 508 U.S. at 662.   Justice Thomas wrote:

> There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so.  Nor does it matter that the new ordinance differs in certain respects from the old one.  *City of Mesquite* does not stand for the proposition that it is only the possibility that the selfsame statute will be enacted that prevents a case from being moot; if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect.

508 U.S. at 662.  The Court concluded that the new ordinance disadvantaged plaintiffs "in the same fundamental way" and thus the case was not moot. *Id*. at 662–63.  Justice O'Connor, while dissenting, commented that:

> *City of Mesquite* stands for the proposition that the Court has discretion to decide a case in which the statute under review has been repealed or amended. The Court appropriately

may render judgment where circumstances demonstrate that the legislature likely will reinstate the old law – which would make a declaratory judgment or an order enjoining the law's enforcement worthwhile. But such circumstances undoubtedly are rare.

*Id*. at 677.

Good News' case is one of those rare cases. The amendment of the Sign Code to allow directional signs to be placed in the public right-of-way moots Good News' objection to this provision of the Sign Code, but the new restriction, limiting the Temporary Directional Signs exemption to events that take place in Gilbert, bars Good News from erecting any directional signs at all. Thus, a dismissal for mootness would allow Gilbert to continue to limit Good News' speech without further judicial review. Accordingly, the motion to dismiss is denied.[8]

## II.

*Reed* limits our consideration of Good News' challenges to the Sign Code. Although our opinion in *Reed* reviewed the

---

[8] The Ninth Circuit cases cited by Gilbert do not support a different result. In *Log Cabin Republicans v. United States*, 658 F.3d 1162, 1166–67 (9th Cir. 2011), we noted that when a statutory repeal or amendment provides a plaintiff with everything it hoped to achieve, the controversy is moot. Similarly, in *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 901 (9th Cir. 2007), we noted that "[b]ecause there is no longer any risk that Outdoor Media will be subject to the challenged ordinance, there exists no live issue upon which the court could issue prospective relief." Here, Good News has not obtained the relief it seeks and continues to be subject to the limiting ordinance.

denial of a preliminary injunction, our determinations included conclusions of law. Furthermore, on remand, the parties agreed to resolve all remaining issues on cross-motions for summary judgment. There is no indication that the parties engaged in further discovery, and Good News has not asserted any evidentiary facts in this appeal that were not before us in *Reed*. Thus, our opinion in *Reed* constitutes law of the case, *see Minidoka Irrigation Dist. v. Dep't of Interior*, 406 F.3d 567, 573 (9th Cir. 2005),[9] and is binding on us. *See Santamaria v. Horsley*, 110 F.3d 1352, 1355 (1997) ("It is settled law that one three-judge panel of this court cannot ordinarily reconsider or overrule the decision of a prior panel.").

*Reed* establishes first that "§ 4.402(P) is not a content-based regulation," *Reed*, 587 F.3d at 979, and second that the Sign Code generally is a reasonable (i.e., not unconstitutional) time, place and manner restriction. *Id*. at 980. The single issue remanded, and hence the primary substantive issue before the district court and now on appeal, is whether the Sign Code improperly discriminates between different forms of noncommerical speech.

---

[9] In *Minidoka*, we recognized that, under the law of the case doctrine, "a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." 406 F.3d at 573 (citing *Old Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002)). We noted that "the law of the case doctrine is subject to three exceptions that may arise when (1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Id*. (internal quotation marks omitted). None of these exceptions apply here. As we subsequently explain, our opinion in *Reed* is not "clearly erroneous." Moreover, there is no "intervening controlling authority" nor any "substantially different evidence."

We review de novo the district court's grant of summary judgment in favor of Gilbert. *G.K. Ltd.*, 436 F.3d at 1070; *Arakaki v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002) ("We review a district court's grant of summary judgment de novo."); *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc) ("We review de novo a grant of summary judgment").

## A. The Evolving Standard for Evaluating the Regulation of Noncommercial Speech

Judicial review of the regulation of noncommercial speech has evolved over the last 30 years. In 1981, Justice White, in his plurality opinion in *Metromedia*, 453 U.S. at 514, stated that while a city "may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests." Seven years later in *National Advertising Co. v. City of Orange*, 861 F.2d 246, 249 (9th Cir. 1988), we recognized that an ordinance would be invalid if it imposed greater restrictions on noncommercial than on commercial billboards. We noted that a restriction based on content would be unconstitutional unless it was narrowly drawn to serve a compelling interest, but suggested that the city was nonetheless "not powerless to regulate billboards containing noncommercial messages." *Id*. In *Desert Outdoor Advertising, Inc. v. City of Moreno Valley*, 103 F.3d 814, 819 (9th Cir. 1996), we indicated that an ordinance regulating noncommercial speech would be invalid if it imposed greater restrictions on noncommercial than commercial billboards or if it regulated noncommercial billboards "based on their content." Regarding Gilbert's Sign Code, we have already

held that it does not impose greater restrictions on noncommercial signs than commercial signs, and thus the critical issue now before us is whether the Sign Code improperly regulates noncommercial temporary signs based on their content.

The definition of "content neutral" has also evolved over the last couple of decades. In *Foti*, relying on *Desert Outdoor*, we indicated that when an officer must examine the contents of a sign to determine whether an exemption applies, the ordinance is content-based. *Foti*, 146 F.3d at 636. However, we also noted the Supreme Court's advice that "laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based," and that a "speech restriction is content neutral if it is justified without reference to the content of the regulated speech." *Id*. at 638 (quoting *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 643 (1994), and *Clark v. Cmty. for Creative, Non-Violence*, 468 U.S. 288, 293 (1984)).

More recently, following these guidelines we have fashioned a more nuanced standard. In *G.K. Ltd.*, we held that "[n]either the speaker- nor event-based exemptions implicate *Foti* insofar as neither requires law enforcement officers to read a sign's message to determine if the sign is exempted from the ordinance." 436 F.3d at 1078. The standard of review set forth is:

> The "government may impose reasonable restrictions on the time, place, or manner of engaging in protected speech provided that they are adequately justified without reference to the content of the regulated speech." *City of Cincinnati v. Discovery Network, Inc.*,

> 507 U.S. 410, 428 (1993) (internal quotation marks and citation omitted). In addition to being justified without reference to content, the restrictions must be "narrowly tailored to serve a significant governmental interest and . . . leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citing *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

436 F.3d at 1071 (parallel citations omitted).

In *Reed*, applying this standard, we concluded that the Sign Code "does not single out certain content for differential treatment, and in enforcing the provision an officer must merely note the content-neutral elements of who is speaking through the sign and whether and when an event is occurring." 587 F.3d at 979. Nonetheless, this appeal raises two unanswered questions under the *G.K. Ltd*. standard: (1) are the differing restrictions between types of noncommercial speech "adequately justified without reference to the content of the regulated speech"; and (2) are they narrowly tailored? The first issue is the fulcrum of this appeal.

### B. The Restrictions on Types of Noncommercial Speech are not Based on the Content of the Speech.

The thrust of Good News' challenge to the Sign Code is that its different restrictions for different types of noncommercial speech are inherently content-based and thus unconstitutional. However, we rejected this general argument

in *Reed* when we held that distinctions based on the speaker or the event are permissible where there is no discrimination among similar events or speakers. 587 F.3d at 979 ("We conclude that § 4.402(P) is not a content-based regulation: It does not single out certain content for differential treatment, and in enforcing the provision an officer must merely note the content-neutral elements of who is speaking through the sign and whether and when an event is occurring."). Thus, under *Reed*, the distinctions between Temporary Directional Signs, Ideological Signs, and Political Signs are content-neutral. That is to say, each classification and its restrictions are based on objective factors relevant to Gilbert's creation of the specific exemption from the permit requirement and do not otherwise consider the substance of the sign. The Political Signs exemption responds to the need for communication about elections.[10] The Ideological Sign exemption recognizes that an individual's right to express his or her opinion is at the core of the First Amendment. The Temporary Directional Sign exemption allows the sponsor of an event to put up temporary directional signs immediately before the event. Each exemption is based on objective criteria and none draws distinctions based on the particular content of the sign. It makes no difference which candidate is supported, who sponsors the event, or what ideological perspective is asserted. Accordingly, as the speaker and event determinations are generally "content neutral," Gilbert's different exemptions for different types of noncommercial speech are not prohibited by the Constitution.

---

[10] Arizona has enacted legislation that prohibits a city from removing a political sign from the public right-of-way during a 60-day period before a primary election. *See* Ariz. Rev. St. § 16-1019.

Our reading of *Reed* is in accord with our opinion in *G.K. Ltd.* There the town ordinance banned most pole signs but had a grandfather clause for preexisting signs. 436 F.3d at 1072. We determined that "the City's restriction on plaintiffs' pole sign is not a content-based regulation of plaintiffs' speech." *Id.* We commented:

> The pole sign restriction is not a "law[ ] that by [its] terms distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 643 (1994). The Code restricts all pole signs across the City's general commercial zones without creating exceptions for preferred content. *Cf. Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th Cir. 1998). The burdens imposed by these pole sign restrictions are borne equally by all of the City's residents. *See Turner Broad. Sys.*, 512 U.S. at 643. Further, plaintiffs offer no evidence suggesting illicit motive or bias on the part of the City or that the City banned pole signs in general, or their pole sign in particular, because of a desire to stifle certain viewpoints. *See City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).

*Id.* at 1071–72 (parallel citations omitted). The plaintiffs in *G.K. Ltd.* argued that ordinance's grandfather clause rendered it content-based because town officials would have to read the pole sign to see if it had changed. *Id.* at 1078. We rejected this argument, explaining:

> Unlike *Foti*'s exemptions, the grandfather clause does not require Lake Oswego officials to evaluate the substantive message on the preexisting sign and the clause certainly does not favor speech "based on the idea expressed." *Id*. at 636 n.7. A grandfather provision requiring an officer to read a sign's message for no other purpose than to determine if the text or logo has changed, making the sign now subject to the City's regulations, is not content-based. *See Hill v. Colorado*, 530 U.S. 703, 721 (2000) ("We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct.").

*Id*. at 1079 (parallel citations omitted).  Under the controlling precedent of *Reed* and *G.K. Ltd.*, Good News has not shown that the Sign Code imposes a content-based limitation.[11]

---

[11] Our earlier opinions cited by Good News, *City of Orange*, 861 F.2d 246, and *Desert Outdoor*, 103 F.3d 819, are not contrary to this conclusion. Our opinions have consistently required that the regulation of noncommercial speech be content-neutral (some times expressed as not content-based). *See City of Orange*, 861 F.2d at 249 (holding "only that the City cannot analyze the content of outdoor noncommercial messages to determine whether they are allowed, and if so where"); *see also Desert Outdoor*, 103 F.3d at 820 (holding that the City's ordinance "violates the First Amendment because it regulates noncommercial speech on the basis of content"). *G.K. Ltd.* and *Reed* similarly require that the regulation of noncommercial speech not be content-based, but, as we have explained, apply a more nuanced standard for making that determination.

### C.  Supreme Court Precedent Affirms our Definition of Content Neutral.

As suggested in *G.K. Ltd.*, our approach is in accord with the Supreme Court's opinion in *Hill v. Colorado*, 530 U.S. 703 (2000).    In *Hill*, the plaintiffs challenged "the constitutionality of a 1993 Colorado statute that regulates speech-related conduct within 100 feet of the entrance to any health care facility." *Id*. at 707.  In holding that the statute was constitutional, the Supreme Court commented that it had "never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *Id*. at 721.  The Court noted that the statute:

> places no restrictions on – and clearly does not prohibit – either a particular viewpoint or any subject matter that may be discussed by a speaker.  Rather, it simply establishes a minor place restriction on an extremely broad category of communications with unwilling listeners.  Instead of drawing distinctions based on the subject that the approaching speaker may wish to address, the statute applies equally to used car salesmen, animal rights activists, fundraisers, environmentalists, and missionaries.

*Id*. at 723.    Similarly, Gilbert's Sign Code places no restrictions on the particular viewpoints of any person or entity that seeks to erect a Temporary Directional Sign and the exemption applies equally to all.

Furthermore, in *Hill*, the Supreme Court explained why a statute, which only restricted certain types of speech-related conduct,[12] is properly considered content neutral. The Court reiterates that "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* at 719 (quoting *Ward*, 491 U.S. at 791). It then offers three reasons for why the statute is content neutral:

> First, it is not a "regulation of speech." Rather, it is a regulation of the places where some speech may occur. Second, it was not adopted "because of disagreement with the message it conveys." . . . Third, the State's interests in protecting access and privacy, and providing the police with clear guidelines, are unrelated to the content of the demonstrators'

---

[12] Justice Stevens' opinion for the court begins by stating:

> At issue is the constitutionality of a 1993 Colorado statute that regulates speech-related conduct within 100 feet of the entrance to any health care facility. The specific section of the statute that is challenged, Colo. Rev. Stat. § 18-9-122(3) (1999), makes it unlawful within the regulated areas for any person to "knowingly approach" within eight feet of another person, without that person's consent, "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person . . . ."

530 U.S. at 707.

> speech. As we have repeatedly explained, government regulation of expressive activity is "content neutral" if it is justified without reference to the content of regulated speech.

530 U.S. at 719–20. The Court further stated that it had "never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *Id*. at 721. The Supreme Court also distinguished its opinion in *Carey v. Brown*, 447 U.S. 455 (1980), noting that the Colorado statute "places no restrictions on – and clearly does not prohibit – either a particular viewpoint or any subject matter that may be discussed by a speaker." *Id.* at 723. Finally, in response to Justice Scalia's concern that content-based legislation can be used for invidious thought-control purposes, the Court stated: "[b]ut a statute that restricts certain categories of speech only lends itself to invidious use if there is a significant number of communications, raising the same problem that the statute was enacted to solve, that fall outside the statute's scope, while others fall inside." *Id*.

Gilbert's regulation of Temporary Directional Signs is content-neutral as that term is defined by the Supreme Court in *Hill*. Gilbert did not adopt its regulation of speech because it disagreed with the message conveyed. Rather, it exempted from the permit requirement all directional signs regardless of their content.[13] The Code is "a regulation of the places

---

[13] An argument can be made that Gilbert's exemption of temporary signs from its permit requirements and limitations on such temporary signs may be construed as disapproval of temporary signs generally. However, this is not the type of "disagreement with the message" proscribed by the Supreme Court in *Hill*, 530 U.S. at 719. Obviously, any legislation

where some speech may occur," and was not adopted "because of any disagreement with the message it conveys." *Id.* at 719. Also, Gilbert's interests in regulation temporary signs are unrelated to the content of the sign. Moreover, there is no danger of the regulation being used for invidious thought-control purposes as the Sign Code does not purport to regulate the content of Temporary Directional Signs. Because Gilbert's Sign Code places no restrictions on the particular viewpoints of any person or entity that seeks to erect a Temporary Directional Sign and the exemption applies to all, it is content-neutral as that term has been defined by the Supreme Court.[14]

---

regulating speech is based on a view that the speech should not be unlimited. This does not render the legislation unconstitutional. In *Hill*, the Supreme Court explained:

> In this case, it is not disputed that the regulation affects protected speech activity; the question is thus whether it is a "reasonable restrictio[n] on the time, place, or manner of protected speech." *Ward*, 491 U.S., at 791, 109 S. Ct. 2746. Here, the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive. As Justice Jackson observed, "there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally." *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 112, 69 S. Ct. 463, 93 L. Ed. 533 (1949) (concurring opinion).

530 U.S. at 731. Here, the limitations on Temporary Directional Signs apply equally to all organizations, regardless of their wealth or pedigree.

[14] Our conclusion is consistent with the perspective of the Sixth Circuit in *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 683 (6th Cir. 2012) (upholding a city regulation of picketing at funerals and burials as a

### D. Good News has not shown that the Sign Code's Different Treatment of Different Types of Noncommercial Speech is Unconstitutional.

Although it is conceivable, as the dissent posits, that different exemptions for noncommercial speech might improperly restrict speech, that concern is not presented here. First, as explained, the Temporary Directional Sign exemption is a content neutral. Second, the Temporary Directional Sign exemption is not in competition with other exemptions from the permit requirement. This is not a situation where there are a limited number of billboards or maximum number of temporary signs that may be placed in the public right-of-way. Nor does the erection of temporary directional signs in any way limit any other person's rights to erect political, ideological, or other signs. Accordingly, as long as the Temporary Directional Signs exemption – which is the exemption that was applied to Good News' signs and that Good News challenges – is content neutral and reasonable in relationship to its purpose – providing direction to temporary events – its constitutionality is not affected by the fact that the exemptions for Political Signs or Ideological Signs are different.

The cases cited by the dissent do question distinctions among different categories of non-commercial speech, but none concerned instances in which the types of non-commercial speech were unrelated, and all of the cases have been refined by more recent Supreme Court opinions. In *Police Department of Chicago v. Mosley*, 408 U.S. 92, 96 (1972), the Supreme Court struck down an ordinance as

legitimate time, place, and manner regulation consistent with the First Amendment).

unconstitutional because it sought to distinguish between peaceful labor picketing and other peaceful picketing. Similarly, in *Carey*, 447 U.S. 455 (1980), the Supreme Court struck down an ordinance that sought to distinguish between picketing at a residence from picketing at a place of employment. In *Metromedia*, 453 U.S. 490, the Court, in a fractured opinion, considered an ordinance that differentiated between commercial and non-commercial billboards, but also suggested that the city had less leeway to distinguish between types of non-commercial speech than between types of commercial speech. *Id*. at 514–15. These cases concerned related and competing forms of speech.[15] *Id*. at 514–15. In contrast, Gilbert's Temporary Directional Signs exemption neither restricts nor competes with a person's or entity's ability to take advantage of the exemptions for political, ideological, or other types of temporary signs.

Critically, as noted, over the last thirty years, the Supreme Court has refined the concerns set forth in Justice White's plurality opinion in *Metromedia*. Most notably, in *Hill*, the Supreme Court upheld a statute that clearly distinguished between types of noncommercial speech. The statute prohibited the noncommercial speech of "approaching" an individual "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person." 530 U.S. at 707. No other form of noncommercial speech was regulated. Nonetheless, the Supreme Court upheld the ordinance.

---

[15] Similarly, our opinion in *National Advertising*, 861 F.2d 246, and *Desert Outdoor Advertising*, 103 F.3d 814, held that cities could not impose greater restrictions on non-commercial billboards than commercial billboards and could not regulate non-commercial billboards based on content.

Similarly, in *Ward*, the Supreme Court stated that a "regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." 491 U.S. at 791. Thus, the Sign Code's different provisions for Political, Ideological and Temporary Directional Signs is not in itself unconstitutional.

Although Good News voices some objections to the size, location, and duration limitations on its signs, Good News does not assert that the restrictions actually interfere with the purpose of the signs: providing directions to Good News' services. Moreover, courts have generally deferred to municipal decisions concerning the actual limitations on the sizes and shapes of signs. *See Ward*, 491 U.S. at 800 ("So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."); *Foti*, 146 F.3d at 641 (noting that the "restrictions on the size and number of picket signs are reasonable legislative judgments in light of the City's concerns for traffic safety"); *City of Orange*, 861 F.2d at 249 ("Under *Metromedia*, the City's interests in traffic safety and aesthetics are sufficient to justify continued content-neutral regulation of the noncommunicative aspects of billboards, such as size, spacing and design.").

### E. The Temporary Directional Signs Exemption is Narrowly Tailored to Serve Significant Governmental Interests

The Supreme Court has explained that "[c]ontent-neutral regulations do not pose the same inherent dangers to free expression that content-based regulations do, and thus are subject to a less rigorous analysis, which affords the Government latitude in designing a regulatory solution." *Turner Broadcasting System, Inc. v. F.C.C.*, 520 U.S. 180, 213 (1997) (internal quotation marks and citation omitted).[16] Nonetheless, a content-neutral, reasonable time, place and manner restriction must also be narrowly tailored to serve a significant governmental interest and leave open ample alternative channels of communication. *G.K. Ltd.*, 436 F.3d at 1071.[17]

There is no real question that Gilbert's interests in safety and aesthetics are significant. *See One World One Family Now v. City & Cnty. of Honolulu*, 76 F.3d 1009, 1013 (9th

---

[16] The Court further stated, citing *Ward*, 491 U.S. at 799, and *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 662 (1994), that "[u]nder intermediate scrutiny, the Government may employ the means of its choosing so long as the . . . regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further that interest." (internal quotation marks omitted).

[17] To the extent that our opinion in *Seattle Affiliate of Oct. 22nd Coalition to Stop Police Brutality v. City of Seattle*, 550 F.3d 788, 791 (9th Cir. 2008), further requires that an ordinance not delegate overly broad discretion to a government official, this condition is satisfied. A person does not need any approval to erect a temporary sign. Rather, Gilbert will only seek the removal of a sign if its size or duration violates the Sign Code's relatively clear time, place, and manner limitations.

Cir. 1996) (holding that cities have substantial interests in protecting the aesthetic appearance of their communities and in assuring the safe and convenient circulation on their streets); *see also Metromedia*, 453 U.S. at 507–08 ("Nor can there be substantial doubt that the twin goals that the ordinance seeks to further – traffic safety and the appearance of the city – are substantial governmental goals."). Good News argues only that such interests are not "sufficiently compelling to satisfy a content-based sign code," but we find that the Sign Code does not impose any content-based restriction.

Good News contends that the Sign Code is not narrowly tailored because all temporary signs placed within the public right-of-way implicate safety and aesthetic concerns, but Temporary Directional Signs are more severely limited than Political and Ideological Signs.

Political and Ideological Signs may infringe on Gilbert's interests to a greater extent than Temporary Directional Signs, but for a number of reasons this is permissible. First, unlike political, ideological and religious speech which are clearly entitled to First Amendment protection, there does not appear to be a constitutional right to an exemption for Temporary Directional Signs. If Good News has no constitutional right to erect Temporary Directional Signs, how can it suffer a cognizable harm when Gilbert creates an exemption facilitating the display of such signs?

Second, each exemption reflects a balance between Gilbert's interests and the constitutional interests of the type of sign covered. With the recent amendment to the Sign Code, there are no longer any differences as to where temporary signs may be located. The differences as to

duration are based on the natures of the types of speech involved.  Thus, under Arizona law political signs are allowed for an extended period of time before an election. Ideological signs, not being tied to any event, have no time limit.  However, the purpose of a Temporary Directional Sign inherently contemplates a limit on duration.

Third, as noted, the exemptions are not in competition. The exemptions are not competing for limited space and the erection of one type of temporary sign does not preclude the placement of another.  Accordingly, each exemption may be evaluated on its own merits.

Fourth, there is no showing that the restrictions on Temporary Directional Signs interfere with their purpose: directing interested individuals to temporary events.  Good News does not allege that the public cannot see its signs or that the size limit is too small to allow it to adequately provide directions.

Finally, as also noted, courts generally defer to a city's determinations of size and duration. *See Ward*, 491 U.S. at 800; *Foti*,146 F.3d at 641.  Here, the restrictions on Temporary Directional Signs are reasonable.  There are no limits on the number of events that a person or entity may hold, and no limit on the number of signs that may be erected (other than no more than four on any single piece of property).  Also, the 12-hour limitation seems reasonable as a person is unlikely to seek directions to an event more than 12 hours before the event.

We conclude that these considerations refute Good News' arguments that to be narrowly tailored restrictions on types of noncommercial speech must be uniform or vary only to the

extent that the type of speech affects a town's interests. Our opinions in *G.K. Ltd.* and *Reed* support, if not compel, our conclusion. In *G.K. Ltd.*, we held a total ban on changed pole signs was narrowly tailored because pole signs could reasonably be perceived as aesthetically harmful and distracting to travelers, even though this is also true of unchanged pole signs. *See* 436 F.3d at 1074. In *Reed*, we determined that "[t]he restrictions on time, place and manner imposed by on the display of [signs] would indeed appear to 'actually advance' the aesthetic and safety interests by limiting the size duration and proliferation of signs." 587 F.3d at 980. Our determination in *Reed* that the Sign Code is narrowly tailored, if not controlling, remains sound.

In sum, (a) Gilbert was not required to create an exemption for Temporary Directional Signs, (b) the restrictions on directional signs are rationally related to the purpose of the directional signs, and (c) the restrictions are reasonably designed to promote Gilbert's interests in aesthetics and safety. True, the number of temporary signs might be substantially reduced if there were not exemptions for political and ideological signs, but those signs raise different legal rights and interests that Gilbert has to respect. Moreover, there need only be a reasonable fit between the Gilbert's interest and the regulations. *See Hill*, 530 U.S. at 726 (stating that "when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal"); *see also Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) ("What our decisions require is a 'fit' between the legislature's ends and the means chosen to accomplish those ends – a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best

disposition but one whose scope is in proportion to the interest served.") (internal quotation marks and citation omitted). At least between elections, the Sign Code may well limit the number of temporary signs in Gilbert without unreasonably limiting anyone's speech, and thus the Sign Code serves significant governmental interests.

Finally, the Sign Code leaves open ample alternate means of communication. Assuming that Good News events are eligible for the exemption, it may erect as many temporary signs as it wants twelve hours before each scheduled event. The Sign Code does not regulate any of the many other ways in which Good News can "go and make disciples of all nations." Indeed, there is no suggestion that Good News' tenets require that it or its members erect temporary directional signs. Thus, the Sign Code's restrictions do not require that the members of Good News violate any cardinal principle of their faith, *see Sherbert v. Verner*, 374 U.S. 398, 406 (1963), and do not limit the many other ways the members may advertise their services and attract individuals.

### F. Good News' Other Challenges do not Merit Relief

**1.** To prevail on its claims of violation of its members' right to the free exercise of religion under the Constitution and under Arizona's Free Exercise of Religion Act, Ariz. Rev. St. § 41-1493, Good News must show that "the government action substantially burdens the exercise of religious beliefs." *State v. Hardesty*, 222 Ariz. 363, 366 (Ariz. 2009). Good News' free exercise claim fails because the Sign Code's restrictions on the size and duration of Temporary Directional Signs is a generally applicable law, and it does not substantially interfere with any of Good News' tenets. The Supreme Court has held that religion may

not exempt a person from complying with neutral laws. *See Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878–79 (1990) (holding that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." (internal quotation marks and citation omitted)). Furthermore, while Good News' members may be obligated to spread their message and advertise their events, there is no suggestion that Good News' tenets require that they do so in any particular way. Accordingly, we agree with the district court that the Sign Code's restrictions on Temporary Directional Signs do not constitute a substantial burden on Good News' free exercise rights.

**2.** We also agree with the district court that the Sign Code is not vague or overbroad. The Supreme Court noted in *Ward*, 491 U.S. at 794, that "perfect clarity and precise guidance have never been required even of regulations that restrict express activity." Good News' claim of vagueness is based on an alleged lack of definitions for signs that arguably meet the requirements of more than one temporary sign exemption. However, Gilbert officials claim that they have yet to see such a sign and Good News does not argue that its signs meet the requirements of more than one exemption.[18]

---

[18] Moreover, the procedures for enforcing the Sign Code respect the rights of a speaker. If an official noted a temporary sign that fits within two exemptions, he or she would check with the city manager and Gilbert would presumably accord the sign the broader exemption. Thus, a political sign with directions would be allowed the duration limit for political signs. Similarly, a religious sign that also included directions might qualify as an ideological sign. Good News has never asserted that its temporary directional signs should be treated as ideological signs.

In addition, in *Reed*, 587 F.3d at 974, we held that Good News' mounted only an as-applied challenge to the Sign Code. This is law of the case, and is not really challenged by Good News.

**3.** Good News' assertion that the Sign Code violates its right to equal protection of law is basically a revision of its argument that Gilbert cannot treat different types of noncommercial speech differently. Clothed in the garb of equal protection the argument still is not persuasive. The Sign Code does not make any distinctions based on religion. Rather, the Temporary Directional Signs exemption is available to all noncommercial entities. Because we conclude that the Sign Code is not unconstitutional just because it differentiates between types of noncommercial signs, Good News' equal protection argument depends on it establishing a cognizable class of noncommercial entities wishing to erect temporary directional signs to their events whose interests may be compared to some other class. Good News has failed to identify such entities.

### G. Any Challenge Good News May Advance to the Amended Sign Code Should Be Initially Litigated in the District Court

Although the amendment to the Sign Code does not moot this appeal, we need not, and do not, determine the merits of the amendment. Unlike the situation before the Supreme Court in *Northeastern Florida*, 508 U.S. 656, here the amendment arguably increases rather than decreases the barriers to Good News erecting temporary directional signs. Also, unlike the holding in *Northeastern Florida*, we have determined that Good News has not shown that the other restrictions imposed by the Sign Code violate its

constitutional rights. However, the added restriction to the Sign Code – that Temporary Directional Signs are only exempt from the permit requirement if they concern events that take place within the Town of Gilbert – is different in nature from the time, place, and manner restrictions that Good News previously challenged. Moreover, even if we assume that Good News will challenge the new restriction, we do not know what constitutional and legal arguments Good News will present in challenging the restriction, or what defenses Gilbert will proffer. Accordingly, any challenge Good News may have to the amendment limiting the Temporary Directional Sign exemption to events in the Town of Gilbert should be raised in the first instance in the district court. As we affirm the district court's grant of summary judgment for Gilbert, we leave it to the district court to determine whether Good News may seek to amend its existing complaint or should file a new complaint.

### III

In *Reed*, 587 F.3d 966, and *G.K. Ltd.*, 436 F.3d 1064, we held that distinctions based on the speaker or the event are permissible where there is no discrimination among similar events or speakers. In *Hill*, 530 U.S. at 703, the Supreme Court indicated that not all types of noncommercial speech need be treated the same. *See also Ward*, 491 U.S. 791 (noting that a "regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."). Applying this case law to the Town of Gilbert's Sign Code's treatment of different types of noncommercial speech, we conclude that the treatment is content-neutral.

That is to say, each exemption allowing for the erection of temporary signs and its restrictions are based on objective factors relevant to the creation of the specific exemption and do not otherwise consider the substance of a sign. We further conclude that the exemptions are narrowly tailored because they serve significant governmental interests and leave open ample alternative channels of communication. We also conclude that the Sign Code does not violate Good News' (or its members') right to the free exercise of religion or right to equal protection of law, and is not unconstitutionally vague or overbroad. The district court's grant of summary judgment in favor of the Town of Gilbert is **AFFIRMED**.

---

WATFORD, Circuit Judge, dissenting:

I agree with the majority that the post-judgment amendments to the Town of Gilbert's sign ordinance do not render this appeal moot. But I disagree with the majority's conclusion that the sign ordinance is constitutional.

When this case first came before us, we evaluated § 4.402(P) of Gilbert's sign ordinance in isolation. *See Reed v. Town of Gilbert*, 587 F.3d 966, 976–79 (9th Cir. 2009) (*Reed I*). That provision specifies the restrictions applicable to "temporary directional signs relating to a qualifying event," such as the signs plaintiff Good News Community Church seeks to display inviting people to attend its Sunday morning services.[1]    We held that, with respect to the

---

[1] "Temporary directional signs relating to a qualifying event" are defined as signs "intended to direct pedestrians, motorists, and other passersby to a 'qualifying event.' A 'qualifying event' is any assembly, gathering,

temporary directional signs it covers, § 4.402(P) is content-neutral. *Id.* at 979. We reached that conclusion because, considered on its own, § 4.402(P) "does not single out certain content for differential treatment, and in enforcing the provision an officer must merely note the content-neutral elements of who is speaking through the sign and whether an event is occurring." *Id.*

What we did not decide in *Reed I* is whether § 4.402(P) is impermissibly content-based when viewed in relation to the other provisions of Gilbert's sign ordinance. In particular, we noted that the district court had not addressed plaintiffs' argument that "the ordinance unfairly discriminates among forms of noncommercial speech," *id.* at 971, by granting more favorable treatment to signs that Gilbert categorizes as "political" and "ideological." *Id.* at 983. We therefore remanded the case for resolution of plaintiffs' "First Amendment and Equal Protection claims that the Sign Code is unconstitutional in favoring some noncommercial speech over other noncommercial speech." *Id.*

The Fourteenth Amendment's Equal Protection Clause and the First Amendment's Free Speech Clause prohibit the government from favoring certain categories of non-commercial speech over others based solely on the content of the message being conveyed. *See Carey v. Brown*, 447 U.S. 455, 459–61 (1980); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). When regulating speech in a public forum, the government may draw distinctions among different categories of non-commercial speech only if those

---

activity, or meeting sponsored, arranged, or promoted by a religious, charitable, community service, educational, or other similar non-profit organization."

distinctions are justified by some non-communicative aspect of the speech involved. *See Carey*, 447 U.S. at 465; *Mosley*, 408 U.S. at 100. For example, a State may not exempt labor picketing from a general ban on picketing in front of homes (enacted to protect residential privacy), unless it can show that labor picketing is inherently less disruptive of residential privacy than picketing on other subjects. *Carey*, 447 U.S. at 465. The reason is simple: Within the realm of non-commercial speech, the government may not decide that speech on certain subjects is more (or less) valuable—and therefore more (or less) deserving of First Amendment protection—than speech on other subjects. *Id.* at 466; *see Mosley*, 408 U.S. at 96.

The Supreme Court relied on this general principle to strike down a municipal sign ordinance in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981). A plurality of the Court invalidated San Diego's ordinance banning most non-commercial billboards on the ground that the ordinance impermissibly granted exemptions for billboards bearing non-commercial speech on favored subjects, such as political campaign messages. *Id.* at 514 (plurality opinion). The plurality held that, although cities "may distinguish between the relative value of different categories of commercial speech," they do not have the same freedom in the realm of non-commercial speech "to evaluate the strength of, or distinguish between, various communicative interests." *Id.* (citing *Carey*, 447 U.S. at 462; *Mosley*, 408 U.S. at 96). San Diego could not identify any non-communicative aspect of the speech at issue to justify the distinctions it had drawn. It failed to show, for example, that the non-commercial billboards it banned had any greater effect on the city's asserted interests in promoting traffic safety and aesthetics than the non-commercial billboards it permitted. *See id.* at

513; *see also Desert Outdoor Adver., Inc. v. City of Moreno Valley*, 103 F.3d 814, 820 (9th Cir. 1996) (applying *Metromedia* plurality's holding); *Nat'l Adver. Co. v. City of Orange*, 861 F.2d 246, 248–49 (9th Cir. 1988) (same).

Contrary to the majority's suggestion, *Hill v. Colorado*, 530 U.S. 703 (2000), did not modify or refine the core principle underlying *Mosley*, *Carey*, and *Metromedia*. The statute at issue in *Hill* prohibited, within certain designated areas, approaching within eight feet of another for the purpose of engaging in oral protest, education, or counseling. *Id.* at 707. The Court held that the statute was content-neutral because it regulated a particular mode of communication— approaching within eight feet of another to engage in oral protest, education, or counseling—without regard to the subject of the speaker's message. *Id.* at 720–24. As the Court stressed, "Instead of drawing distinctions based on the subject that the approaching speaker may wish to address, the statute applies equally to used car salesmen, animal rights activists, fundraisers, environmentalists, and missionaries." *Id.* at 723. (As explained below, the ordinance at issue in this case does draw distinctions based on the subject the speaker wishes to address.) Thus, rather than distinguishing among different categories of non-commercial speech based on the message being conveyed, the Colorado statute prohibited *all* non-commercial speech expressed through a particular mode of communication—a fact that rendered *Carey* "easily distinguishable." *Id.*

Gilbert's sign ordinance violates the First and Fourteenth Amendments by drawing content-based distinctions among different categories of non-commercial speech. The most glaring illustration is the ordinance's favorable treatment of "political" and "ideological" signs relative to the treatment

accorded the non-commercial signs plaintiffs seek to display. Under the ordinance, plaintiffs' temporary directional signs may not exceed six square feet in size and may not be displayed more than 12 hours before or one hour after the relevant event—here, Sunday morning church services. (Given the 9:00 a.m. start time of Good News's church services, this durational restriction limits the display of plaintiffs' signs to periods when it is virtually always dark.) In contrast, "political" signs—defined as "[a] temporary sign which supports candidates for office or urges action on any other matter on the ballot of primary, general and special elections relating to any national, state or local election"—may be up to 32 square feet in size and may be displayed any time prior to an election and removed within 10 days after the election. "Ideological" signs—defined as "a sign communicating a message or ideas for non-commercial purposes" that is not a construction, directional, political, or garage sale sign—may be up to 20 square feet in size and are not subject to any durational limits at all.[2]

Gilbert's sign ordinance plainly favors certain categories of non-commercial speech (political and ideological signs) over others (signs promoting events sponsored by non-profit organizations) based solely on the content of the message being conveyed. These are not content-neutral "speaker" and

---

[2] Until recently, Gilbert's sign ordinance contained an even more blatantly discriminatory distinction: Political and ideological signs could be displayed in the public right of way but "temporary directional signs relating to a qualifying event" could not. After the parties filed their briefs in this court, Gilbert removed this restriction but replaced it with an equally suspect one. Under the amended ordinance, "temporary directional signs relating to a qualifying event" may not be displayed *anywhere* in Gilbert unless the "qualifying event" takes place within the town's borders.

"event" based distinctions, like those we approved in *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1076–78 (9th Cir. 2006), and in *Reed I*, 587 F.3d at 977–78, when we reviewed § 4.402(P) standing alone.  Determining whether a particular sign will be regulated as a "political" sign as opposed to an "ideological" sign or a "temporary directional sign relating to a qualifying event" turns entirely on the content of the message displayed on the sign.  *Cf. G.K. Ltd.*, 436 F.3d at 1078 (speaker and event based distinctions were content-neutral because they applied "without regard for the actual substance of the message" and "regardless of content").

The content-based distinctions Gilbert has drawn are impermissible unless it can identify some non-communicative aspect of the signs at issue to justify this differential treatment.  *See Metromedia*, 453 U.S. at 513; *Carey*, 447 U.S. at 465; *Mosley*, 408 U.S. at 100.  Gilbert has merely offered, as support for the sign ordinance as a whole, its interest in enhancing traffic safety and aesthetics.  Traffic safety and aesthetics are certainly important interests.  But to sustain the distinctions it has drawn, Gilbert must explain why (for example) a 20-square-foot sign displayed indefinitely at a particular location poses an acceptable threat to traffic safety and aesthetics if it bears an ideological message, but would pose an unacceptable threat if the sign's message instead invited people to attend Sunday church services.

Gilbert has not offered any such explanation, and I doubt it could come up with one if it tried.  What we are left with, then, is Gilbert's apparent determination that "ideological" and "political" speech is categorically more valuable, and therefore entitled to greater protection from regulation, than speech promoting events sponsored by non-profit

organizations.  That is precisely the value judgment that the First and Fourteenth Amendments forbid Gilbert to make. *See Metromedia*, 453 U.S. at 514; *Carey*, 447 U.S. at 466; *Mosley*, 408 U.S. at 96.

Nothing we said in *Reed I* is inconsistent with this conclusion.  There we held only that § 4.402(P), viewed in isolation, is a valid content-neutral time, place, and manner regulation.  *Reed I*, 587 F.3d at 979–82.  We did not decide, and instead remanded for the district court to decide, whether Gilbert's sign ordinance draws content-based distinctions by "favoring some noncommercial speech over other noncommercial speech."  *Id.* at 983.  In doing so, we mentioned as potentially relevant *National Advertising Co. v. City of Orange*, 861 F.2d 246 (9th Cir. 1988), where (we noted in *Reed I*) we invalidated a municipal sign ordinance that "made content-based distinctions among categories of noncommercial speech."  *Reed I*, 587 F.3d at 982.  Thus, when we said in *Reed I* that *§ 4.402(P)* "does not single out certain content for differential treatment," *id.* at 979, we obviously did not decide whether *the sign ordinance as a whole* singles out certain content for differential treatment. Otherwise, our remand to the district court would have been entirely unnecessary.

For the reasons given above, I would hold that the regulatory distinctions Gilbert has drawn among different categories of non-commercial speech are unconstitutional, and I would remand for the district court to determine whether those provisions of Gilbert's sign ordinance are severable.  I respectfully dissent from the majority's contrary holding.